## Southern Railway Company in Kentucky v. John T. Barbee & Company.

(Decided December 17, 1920.)

### Appeal from Jefferson Circuit Court (Common Pleas, Fourth Division).

1. Railroads—Duty to Protect Freight Consigned—Negligence—Loss of Property By Mob.—A railroad company's employees in charge of its yards are charged with the duty of protecting freight consigned therein. In such case the railroad company is an insurer and it cannot relieve itself from liability merely by pleading and showing that a mob was in progress unless it further shows that the destruction of property did not result through its negligence.

2. Railroads—Loss of Property in Transit Through Mob.—A railroad company may contract against liability for loss of goods in transit through a mob but it cannot contract against its own negligence, and it cannot relieve itself by showing that the fire was started by a mob, if it appears that by ordinary care it could have saved the property between the starting of the fire and its destruction.

HUMPHREY, CRAWFORD, MIDDLETON & HUMPHREY and LOUIS SEELBACH, JR., for appellant.

LAWRENCE LEOPOLD for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

On June 27, 1917, Barbee & Company shipped a consignment of thirty-nine packages of whiskey from Milner, Kentucky, near Louisville, to a point in Texas, and on the next day shipped two barrels of whiskey to another point in the state of Texas, in each case taking a bill of lading. Neither of the consignments was delivered by the railway company, and this action was

commenced by Barbee & Company against the Southern Railway Company in Kentucky, initial carrier, to recover the value of the whiskey, alleged to be $634.68, avering that the railway company had wrongfully and negligently failed and refused to safely transport or cause to be transported said whiskey from Milner, Kentucky, to the destination in the state of Texas, and then and there safely deliver the same to the consignee, as it had agreed in its bill of lading to do, and had wrongfully failed to account to Barbee & Company, or to any one for the plaintiffs for said whiskey, or any part thereof and had converted the same to its own use. The answer of the railway company traversed the material allegations of the petition. The answer further averred that the bill of lading, the contract between the parties, expressly provided that neither the defendant railway company nor any of its connecting carriers transporting said whiskey should be liable for any loss, damage or injury to same resulting from riots or consequences thereof; that while the said shipment of whiskey was in the ordinary course of transportation from Milner, Kentucky, to its destination in Texas, it was destroyed in and by virtue of a riot occurring in East St. Louis, Illinois; that in said riot and as a direct result thereof the said whiskey was set on fire and in this manner was burned and destroyed without negligence of any kind on the part of the defendant railway company; and further that the railway company had exercised all possible care to safely transport said whiskey and to deliver same to the consignee thereof, and that its destruction was without fault or negligence, or any breach of duty on the part of the railway company, but came about through causes entirely beyond the control of the defendant. A demurrer to the affirmative part of the answer was overruled, whereupon Barbee & Company filed reply in which, after traversing the material parts of the answer, it was averred that the railway company negligently delayed the transportation of the whiskey after it was delivered to it at Milner, and because of such negligence on the part of the railway company the said whiskey failed to arrive in East St. Louis prior to July 2nd, the date of its destruction by the riot, if it was so destroyed, and that the delay was caused by negligence of the railway company and but for said negligence on its part in failing to sooner transport said whiskey so that the same could arrive in East St. Louis and leave

East St. Louis prior to July 2, 1917, the said whiskey would not have become subject to the riot and fire ensuing therefrom; and it was further averred that the delay in transporting said whiskey was a proximate cause and reason for its destruction and the railway company is liable for said negligence. A general demurrer was sustained to this paragraph of the reply. It was further pleaded by the reply that on July 1, 1917, mobs formed in the city of East St. Louis, began committing various excesses and acts of violence and depredations; that hundreds of men began rioting in East St. Louis on July 1, 1917, and in defiance of the public authorities and that these facts were given great notoriety and the public had notice thereof and that the agents and employes of the railway company in charge of the shipment of whiskey knew, or by the exercise of ordinary care, could and should have known that the said mobs were committing said excesses and acts of violence and depredations in that city on July 1, 1917; that the mobs had not dispersed on July 2nd, and that on that day the mobs were committing acts such as endangered the safety of the consignment of whiskey; that the defendant railway company negligently and in disregard of the safety of the goods, permitted and caused the same to be carried over its line of railroad from the city of Louisville, into its yards in the city of East St. Louis while the riots were in progress and to remain in East St. Louis while the riots were in progress at that time for many hours after the arrival of the consignment in that city, and in doing so the railway company was guilty of such negligence as to make it liable for any damage resulting from any acts committed by said mob or said rioters on that date, including the burning of the whiskey. A general demurrer to this paragraph of the answer was overruled.

The rejoinder merely traversed the affirmative allegations of the reply. A trial before a jury resulted in a verdict for Barbee & Company for the full amount claimed, and the railway company appeals.

The parties filed a stipulation of facts which was read as evidence to the jury, and is as follows:

"(1)  On June 27, 1917, the plaintiff John T. Barbee & Company delivered to the plaintiff, Southern Railway Company in Kentucky, at Milner, Kentucky, thirty-eight cases and one box of whiskey, for shipment to San Benito, Texas, consigned to the order of the

plaintiff with instructions to notify Roberts & Buesing. at destination, and a bill of lading was issued, executed and delivered by and between the plaintiff and the defendant, and accepted by the plaintiff, as the contract of shipment between the parties, a copy of which is hereto attached as exhibit 'A.'

"(2)   The said thirty-eight cases and one box of whiskey were of the value of $424.25.

"(3)   On June 28, 1917, the plaintiff delivered to the defendant, at Milner, Kentucky, two barrels of whiskey, for shipment to Cameron, Texas, consigned to the order of the plaintiff, with instructions to notify W. J. Hair, at destination; and a bill of lading therefor was issued, executed and delivered by and between the plaintiff and the defendant, and accepted by the plaintiff, as the contract of shipment between the parties, a copy of which is hereto attached as exhibit 'B.'

"(4)   The value of said two barrels of whiskey was $210.43.

"(5)   The shipment of thirty-eight cases and one box left Milner, Kentucky, on the line of the defendant, on June 27, 1917, and arrived in Louisville the next day (June 28, 1917). ;

"The shipment of two barrels left Milner, Kentucky, on June 28, 1917, on the line of the defendant and arrived in Louisville the same day.

"(6)   These two shipments were at Louisville, Kentucky, placed in one car (S. F. R. D. 11250), and left Louisville at 4:30 a. m., on July 1, 1917, and arrived at the Coapman yards of the Southern Railway Company, in East St. Louis at 10:45 a. m., on July 2, 1917.

"At 4:30 p. m., on July 2, the said car containing the said two shipments was placed on track number 4 in the Sixth street yards, at East St. Louis.

"(7)   About 8:00 p. m., on July 2, 1917, some houses, to-wit: private residences in the vicinity of the Sixth street yards and near the track, and place on said track, where said car was located, were set on fire by the rioters in East St. Louis, and the said car and the two shipments of whiskey therein contained were consumed by the said fire about 8:30 p. m., on July 2, 1917, which fire was communicated to said car from said residences, the conflagration having spread from the said residences to the said car.

"(8)   The shipments of whiskey above referred to are those referred to in the petition."

From the newspapers filed in the record and from the evidence of witnesses it is quite manifest that on July 1, 1917, a race riot of no mean proportions broke out and was raging in East St. Louis, Illinois, and continued throughout that day and the next, resulting in much loss of life and property. Some members of the police force were killed by colored persons and this provoked the riot. Several hundred white persons joined themselves together and went through the city killing and attempting to kill all colored persons, or to drive them out of the city; later on they engaged themselves at burning and destroying the property of colored people and property in which colored people resided. Fires were started in all colored districts of the city and practically all of the so-called black belt was wiped out by the conflagration. The fury of the mob was intensified by its progress and towards the evening of the second day of July a number of fires were started in the negro district alongside and near the yards of the Southern Railway Company, and hundreds of frantic men were firing guns, fighting and threatening and otherwise creating a tremendous tumult near the yards of the railroad company in which the consignment of whiskey with much other freight was situated. Everybody in the city was alarmed by the size and fury of the mob and much of the property was threatened by destructive fires. The newspapers were full of lurid accounts of the doings of the mob. Notwithstanding this the railway company seems not to have taken any precaution whatever, at least none out of the ordinary, to protect the consignment of freight which is the subject of this litigation, nor in fact any freight of which there was a great quantity then in its custody in its yards in the mob stricken city. While there may have been a few watchmen in their several yards about East St. Louis, no extra precaution commensurate with the fire situation and the imminent danger from the mob, was exercised by the railway company, or its employes in charge of the yards, for the protection of the consignment of freight in litigation or any freight in the custody of the railroad in said yards. In fact, it appears from the evidence that the railroad officials in charge of the yards and whose duty it was to look after the safety of the freight therein left their posts of duty early in the evening and went to their homes without having made any special arrangements or effort to inform themselves of the progress of the fires

or the threatened danger to the other freight in the yards from the mob, although the rioting, shooting and burning were going on very near the Sixth street railway yards of the company in which this particular consignment was at the time and in which large quantities of other freight were also standing. Some of the houses burned were within a few feet of the railroad tracks on which loaded cars were standing. This district was largely occupied by colored residents, the object of the mob, and it was common knowledge that the mob was attempting to kill the negroes and to burn and destroy their property, and in fact had been for hours burning their houses and the houses in which they lived.

The railroad employes in charge of the yards were charged with the duty of protecting the freight consigned therein. In fact, the railway company was an insurer and it could not and can not relieve itself of liability merely by pleading and showing that a mob was in progress in the city and that a conflagration started by the mob spread to and consumed the freight in question, unless it further shows that such destruction did not result through its negligence. In other words, if the railway company, by the exercise of ordinary care, could have saved the freight consignment from the fire after its danger from the fire was discovered but failed to do so, it can not be relieved of responsibility by showing that a mob started the fire. It was charged with the duty of exercising ordinary care to save the freight consignment after the fire which threatened its destruction was discovered. If it failed in its duty in this regard it is liable. The accepted rule is that a railroad company may contract against liability for loss of goods while in transit through mobs or riots but it can not contract against its own negligence, and although a fire may be started by a mob the railroad company is not relieved of liability by merely showing that the fire was started by a mob, if the facts are sufficient to show, as in this case, that there was ample time between the starting of the fire and the destruction of the property in which the freight might, by the exercise of ordinary care on the part of the railroad company, have been removed from the danger zone to a safe place. For the purposes of this case, we might wholly disregard the fact that the mob started the fire. It is conceded that the fury of the mob was not in any degree directed toward the destruc-

tion of freight cars or their contents but only towards the shacks near the tracks in which negroes lived.

It is also agreed that the fires in the vicinity of the yards in which the consignment of freight was, started about 5 or 5:30 o'clock in the evening. According to some of the evidence these fires increased very rapidly, starting in different houses in the same district. One witness testifies that as many as ten or twelve fires were going at the same time in the same vicinity. Accompanying all this was a great uproar and much shooting, all of which was calculated to attract attention. There was much flame and smoke which could be seen for a long distance. Notwithstanding this the railway company did not provide any engine in the Sixth street yards that evening with which to handle the freight cars, and in case of emergency to remove them or shift them to avoid the several fires which were in progress nearby, and this though some of the houses in which colored people resided and which were that evening destroyed by fire stood within a few feet of the tracks of the railroad on which loaded freight cars were stored. Stranger still is the fact that no sufficient guard was placed in these yards on that wild night to assist in protecting the property of the railway company and freight in its charge, and no arrangements even were made by the railway officials to keep informed of the progress of the fires towards the freight yards. In fact, the master of the yards did not call up the conductor in charge of a yard engine to ask that he go to the rescue of the burning freight property until about eight o'clock, or perhaps a little later. In other words the fire had been in progress in the district of the freight yards for three hours or more before the railroad company even took the precaution to ask one of its yard crews to take an engine to the Sixth street freight yard and to try to save the burning freight. After this request was made, it took some twenty or thirty minutes for the engine to go from the place it was suituated to the place of the fire. There is much evidence, in fact it is practically conceded, that if an engine had been placed by the railroad company in the Sixth street yards when the fires first originated in that district the consignment of freight, which was lost and of which complaint is now made, would have been saved. This was the plain duty of the railroad company. Common prudence, it seems, would have suggested the propriety of keeping a lookout where a mob

bent on destruction by fire was operating in close proximity to valuable property of which the railroad company was the trustee and insurer. These facts, it seems to us, fully warranted the jury in concluding that the railroad company was guilty of negligence, and the verdict finds abundant support in the facts.

Judgment affirmed.