Statement of the Case.
MONROE, J.
Plaintiff alleges that the defendants named in the caption are indebted to it, in solido, in the sum of $2,487.50, being the value of two car loads of rice, shipped from New Orleans on August 21 and 22, 1908, consigned to Charleston, S. C., and. destroyed, on or about August 26th, at Hamburg, S. C., while in possession of the second-named company; the allegation being that:
“The destruction of said rice was due solely to the negligence, fault, and want of care of the said Southern Railway, its agents and employes.”
The suit is brought on the bills of lading, which are made part of the .petition, and which provide, among other things, that the initial carrier, by which they were issued, shall not be liable for losses occurring beyond the limits of its own lines. Plaintiff, however, alleges, in that connection, that the act of Congress of June 29, 1906, declares that the initial carrier may be held liable for the safe delivery of property intrusted to it under contracts for through shipment, any stipulations in the bills of lading to the contrary notwithstanding. Otherwise than that, the suit is in affirmance of the contracts represented by the bills.
The New Orleans & Northeastern Railroad Company, for answer, denies that the 'petition discloses a cause of action.
The Southern Railway Company admits that it received the cars and alleges that it—
“conveyed them safely to Hamburg, S. C., where there was an extraordinary and unprecedented flood, which could not have been anticipated, and which sudden flood reached a car load of lime, properly placed, and, setting-fire to the same, caused the destruction of twenty-five cars, among which [were] the two cars in question; that this happened without any contributory negligence on its part, and that said sudden and unprecedented flood, which could not have been anticipated, with the resultant fire, was the proximate cause of the destruction of plaintiff’s property. * * * Respondent avers that, under the limitations and exemptions in the Bill of lading sued upon, it is not responsible.”
One of the limitations and exemptions- thus referred to reads as follows:
“Neither this company nor any of its connecting carriers shall be liable for any damage to, or destruction of, said property by fire, unless such damage or destruction shall result, directly and exclusively, from their negligence or that of their employés, and unless such negligence shall be affirmatively established by the owner of said property.”
Plaintiff called one witness, by whom it was shown that the rice in question was worth $2,326.50. Defendant examined 23 witnesses under commissions, and from their testimony it appears that the cars containing the rice were received at Augusta, Ga., on August 25th, and at 1 o’clock on the morning of the 26th were sent across the Savannah river to the old Hamburg yard of the Southern Railway Company, on the South Carolina side, where a train was made up for Charleston, in which the two cars, together with a car of lime, were included; that thereafter, in consequence of a rise in the river, which was not only unprecedented with respect to the volume of water, but more particularly with respect to its suddenness and the lack of warning, the Hamburg yard was inundated to a depth never before known, and the water, coming in contact with the lime, started a fire, which, before it could be reached and extinguished, destroyed most of the ears constituting the train, including those containing the rice. The cause which produced the results thus stated is shown to have been a downpour of rain in that region of South Carolina which is traversed by Rocky river and its tributaries, from Anderson down to Calhoun Palls, where that river empties itself into the Savannah. Some of the witnesses speak of this rainfall as a cloudburst, and they say, generally, that it rained harder, that the streams rose higher and more rapidly, and that the destruction *620 was greater, than was ever before known. J. R. Anderson, superintendent of the Blue Ridge Railway, was at Anderson, and says that it began to rain hard at about 7 o’clock on the evening of August 24th, and continued, in a perfect downpour, until about noon of the following day, and further as follows:
“I think that this rain was the hardest that I have ever seen fall for such a period of time. * * * The waters of all those streams were higher than I have ever known before, and the rise was an exceptionally rapid one. * * * Great vdlumes [of water] were suddenly and unexpectedly thrown in said [Savannah] river.”
J. A. McElroy, farmer and merchant at Sandy Springs, in Anderson county:
“During the night of the 24th, it began to rain very hard, and rained in a continuous downpour until about 2 o’clock p. m. of the 25th. I suppose this unusually hard rain was what is commonly called a cloudburst. * * * 1 have never seen as hard a rain. * * * [The streams] were higher than they had ever b'een known to be before. * * * I can also state that the rise of the waters in those creeks was a great deal swifter and more unexpected than they have ever been before.”
L. E. Campbell, farmer in Anderson county, aged 65:
“The rain fell especially hard on August 25th; in fact, so incessantly that I could not get out of the house to vote. Not a vote was cast in my precinct on account of the high water. * * * The water of Rocky river, at that point, rose 10 to 12 feet higher than it ever rose before. The high water in August, 1908, exceeded ad previous freshets in that vicinity. * * * The rise was much more rapid than I have ever known it before. The flood was more extensive and did a great deal more damage than any other previous flood.”
P. C. Martin, farmer and merchant, Calhoun Falls, aged 69:
“The rains were the heaviest I ever experienced, practically amounting to a cloudburst. * * * The Rocky river rose to a height to which it has never been before, and the rise was a great deal quicker and more sudden than it has ever been before. The whole country about was inundated. * * * The flood was the most destructive that was ever known in the history of South Carolina. • * * In August, 1908, all of these rivers were suddenly flooded by an unexpected and unprecedented fall of rain, as a result of which they rose to heights greater than they had ever been before. This immense volume of water was precipitated upon Augusta, Ga., and Hamburg, S. G., practically without warning to the people in that section.”
P. J. Pfeiffer, farmer, constable, and United States weather observer, at Calhoun Falls, aged 45:
“The rainfall on the morning of August 25th was the hardest and heaviest rainfall that I have ever seen. The streams and rivers * * * were higher than I have ever seen them in my life. The water rose more rapidly than I have ever seen. At one time, it rose 4 inches in 10 minutes. * * * In August, 1908, the greatest volume of water that has ever fallen upon the watershed around Calhoun Falls poured into the Savannah river with great suddenness and caused a most unusually rapid rise in the Savannah river.”
Granville Beale, farmer and dealer in real estate, Calhoun Falls, aged 56:
“The rains which fell were really torrential. They raised the Savannah river to a height at which I have never seen it before. * * * I own an island in the Savannah river, just below the mouth of Rocky river. This island comprised about 310 acres of land, and its surface was about 10 feet above the level of the Savannah river. The great volume of water which poured out of Rocky river into the Savannah river, and united with the already swollen waters of the latter river, washed away about 250 acres of the island above referred to. The rainfall at that time was greater than I have ever known it.”
J. C. Parks, railroad agent and United States river gauger, at Woodlawn, about 17 miles above Augusta, testifies that at 6 o’clock p. m. on August 25th the average depth of water in the Savannah river, at that point, was about 6 feet, and that, on the morning of the 26th, at 6 o’clock—
“the river had risen to a height of 25 or 30 feet and was still rising very rapidly. By 2 o’clock on the same day — the 26th — the river reached a maximum height of 40 feet. * * * This rise * * * was by far the most rapid that I have ever known. * * * I do not believe that the flood of August 26, 1908, could have been anticipated. It came, as a sudden and unexpected deluge, from the country higher up the river, without any warning whatever.”
W. R. Parks1, planter, residing near Parks-ville, within 2 miles of the river, testifies that, to the best of Ms knowledge and belief, *622 the river was 6 feet higher, in that vicinity, than during the fresiiet of 1888.
W. F. Taylor, United States mail delivery clerk, residing at Woodlawn, testifies that the conditions were such as1 to give people notice of the flood in 1888, but that in 1908 the flood descended on them suddenly, unexpectedly, and without warning, from higher up the country, and the river rose more rapidly than in 1888.
J. R. Blackwell, magistrate of Edgefield county, testifies to the same effect.
The official report of the Weather Bureau at Augusta contained the following:
“The excessive rainfalls that occurred in the northeastern portion of the state [meaning the state of Georgia, but referring, also, as we take it, to the rainfalls which 'occurred in the northwestern portion of South Carolina] from the 24th to the 26th caused great damage by floods. The rivers reached heights hitherto unknown, and the .destruction of life and property was very great. The rapidity with which the water rose prevented precautionary measures that would otherwise have been adopted, and thus added to the damage that resulted from the flood.”
The amount of water which thus fell at different points from Calhoun Falls up to the headwaters' of Rocky river, and which that river emptied into the Savannah, during the day and night of August 25th, was appreciated only by those who saw it fall or measured it; and though the officers of the weather Bureau at Augusta published a notice, during the day of the 25th, that the river might be expected to rise to a height oí 33 feet, they were 5.8 feet below the mark, as it ultimately went to 38.8 feet. Up to 12, and possibly 1 o’clock on the night of the 25th, however, the old Hamburg yard, where the train, of which the rice cars and the lime car formed parts1, was standing, was dry, and those cars would have remained dry if the water had not risen above 33 feet.
Hayhoe, the yardmaster, testifies that his* usual working hours were from 7 in the morning to 7 at night, but that on the 25th he received a message from the superintendent that the river was expected to rise, and he therefore stayed at the yard until 12 o’clock and then went home, leaving the river within its banks. On his return, at 7 o’clock on the morning of the 26th, he found the yard under water and the river rising rapidly. But even then he did not know, and had no means of knowing, that a flood, unprecedented in the history of the Savannah river, was upon him, and though he at once took measures of precaution, which were defeated by the flood, it is doubtful whether he really considered that a loaded freight train, standing on solid ground, and the contents of which were above the highest water that had ever been known, save once, was in danger. That he was not alone in failing to appreciate the extent of the impending calamity may be gathered from the following excerpt from his testimony, to wit:
“I knew of several instances of loss by the flood that looked as if people that had lived in Augusta for years did not anticipate, for the reason (sic) that the riverside mills were almost ruined; the Charleston & Western Carolina riverside yard was almost completely wiped out, and several cars washed down the river; several wholesale houses, located in the heart of the city — for instance, Dicks — were badly damaged by the flood ¡ Nixon’s wholesale house was set on fire by lime, though, when the water rose so rapidly, they endeavored to move their goods to higher ground, but, on account of the jiapid rise of the water, they were unable to do so. The water reached their lime, slacked it, and set fire to the building and several men drowned trying to escape from the building.”
The measure of precaution to which we have referred was an attempt by the yardmaster to have an engine haul the train, of which the rice cars formed part, out of the yard and to safer ground.
H. L. Thompson, who acted as conductor of the engine, tells the story of that attempt as follows:
“We did everything that could be done, short of risking human life. I was working as conductor on switch engine No. 1553. We report on the Georgia side of .the river and take our engine out of the yards there over to Hamburg. The engineer has to oil up his engine, and on the morning in question we reached the Ham *624 burg yard at about 7:20 A. M., just ahead of the passenger train, which was leaving Augusta for Charleston, S. O. Upon reaching the Hamburg yard, we had to get off of the main line, on a side track, in order to allow the passenger train to go by. At that time the tracks and switches were under water, and, in order to get to the old Hamburg yard, where the freight cars were, we had to change two switches. This necessitated clearing out the mud and sand from between the switch rails, and consumed some little time. We then proceeded slowly up towards the old Hamburg yard for the purpose of pulling out the cars which were there. To get to the old Hamburg yard, and get at the ears there, We had to pass over three trestles. The first of these trestles was the scale trestle, and, when we passed over it, it went down about 6 inches, showing that the trestle had been undermined. When we reached the next trestle and pushed the tender upon it (we were running with the tender ahead), this trestle sank about 10 inches, and we were afraid to proceed any further. We feared that the engine might turn over. The engineer, the fireman, and myself were, at this time, all on the top of the tender, ready to jump off if the engine turned over. Seeing that we could proceed no further, the engineer jumped in his cab and stopped the engine. Then we proceeded back, along the way we had come and in passing over the scale trestle we noticed that it went down further than when we passed over it going towards the old Hamburg yards. By this time the water was much higher everywhere, and was running through the ash pan of the engine. I think we got put in time to avoid being caught by the engine. We next got hold of three gravel cars and pushed them on the scale trestle, to hold it down and keep it from floating away. The other trestles all washed away. I remained working in the Hamburg yard until about 11 o’clock, but the water had risen so high and the current was so swift that we could do nothing to save the freight. We did not, however, at any time think that the water would rise sufficiently high to get into the freight cars. When I left the Southern Railway yard, I did so in order to go to the assistance of my wife, mother, sister, and child, all of whom were in a house which was in the flood district, and when I reached home the water was within 3 or 4 inches of the floor, and within an hour it was running several inches in the house. I had to move furniture, provisions, etc., to the second story, where we remained until the flood subsided. In my opinion, nothing could have been done to save the freight in the cars, because the water rose so rapidly and suddenly.”
The testimony of Dent, the engineer, is to the same effect. H. W. Tyler, ear inspector, testifies that, when the fire broke out in the freight train, he and some others tried to get a “batteau,” in order to go there and put it out, but that telephone communication had been cut off, and' they had to wait until some one came along in a “batteau” within calling distance; that they secured the “very first one” that they could get, and that he and three other men went over and put out the fire — thereby saving a car load of sheep. He further testifies that the current was very swift, and for that reason, and because of the floating wood and timber, the expedition was a dangerous one. “The water,” he says, “rose about six feet in said yard.”
G. A. Benson formed one of the party referred to in the testimony of Tyler, and corroborates that testimony, adding that they did not get the “batteau” until the morning of August '27th.
M. J. Marcus testifies in part as follows:
“I worked in the Hamburg yard, as freight operator from 11 o’clock p. m., on the night of August 25th, until 8 o’clock a. m., on the morning of August 26th. When I went to work, the yard was entirely free from water, and I had no reason to anticipate that water would get into said yard. I received no communication during the night, forecasting the height to which the water would rise, and the extent of the flood came as a complete surprise to me. When I left work, the water had risen to a height of about 2 feet in front of the office, and, as far as I could see, covered the tracks in the yard generally. * * * I saw Engineer Dent start with an engine and crew and try to get the cars out of .the yard to a place of safety. This was about 8 o’clock, or a little later, on the morning of August 26th. The effort to get at the cars was unsuccessful — due to a floating trestle.”
O. W. Sykes gives the following testimony:
“On the night of August 25, 1908, I was working as yard clerk for the Southern Railway Company at its yard in Hamburg, S. C. At 1 o’clock a. m., on the morning of August 26th, I received car A. G. S. No. 12406 and car O. N. O. No. 15545 [being the ears containing the rice] from the Georgia Railroad. * * * I had the two cars referred to placed in a train of cars which was being made up for Charleston, S. C. * * * I have lived in Augusta all of my life, and in August, 1908, I had been working for the Southern Railway Company for 5 years. I had never seen the Savannah river anywhere near as high as it was in August, 1908. The rise at that time was very rapid and unexpected. I knocked off work at *626 6 a. m. on the morning of August 26th. I went home and got breakfast, and came back.to the office about 7:30 o’clock a. m. I worked around the office until about 11 o’clock a. m., and then had to wade through water almost neck deep in order to get home.”
C. J. Blouut, chief inspector for the Southern Railway Company, has lived in Augusta for 40 years. He says:
“I have never known the waters of the Savannah river to rise as rapidly as they did in August, 1908, and in that respect I consider the freshet in August, 1908, as unprecedented.”
H. L. Hungerford, superintendent of the Charleston Division, Southern Railway, testifies as follows:
“I only know of the condition of the yard at Hamburg and the Savannah river, at the time in question, from reports that were telegraphed to me by the yard master of Hamburg yard. On August 25th the yard was in good condition. The stage of the Savannah river was reported as 22.3 feet on the gauge at Augusta, and a report wras issued from the Weather Bureau that the Savannah river would probably rise.to a stage of 33 feet at Augusta, which, according to previous records, would not do any damage to tracks or cars in Hamburg yard; but during the morning of August 26th the Savannah river rose very rapidly and went far higher than expected — the rapid rise being unprecedented, and unlooked for. By noon of August 26th_the river had reached the stage of 36 feet — continuing to rise and reaching a stage of 38.8 feet at about 2 a. m. August 27th.”
At another place, after repeating the statement that the Weather Bureau had published a warning, on the 25th, of a 33-foot stage of water within the next 24 hours, the witness says:
“At 10:30 a. m., the next day, the gauge registered 34.4 feet and the river was rising at the rate of 0.7 feet per hour. A supplemental warning was then issued, placing- the maximum stage of 38 feet by midnight, and the warning stated that the entire city would probably be submerged. By noon the water was rushing through streets like a mill race.”
Plaintiff obtained judgment against the defendants, in solido, for $2,326.50, and defendants prosecute the appeal.
Opinion — As to the Appeal.
There is a suggestion in the brief of plaintiff’s counsel that the- appeal be dismissed for want of proper parties — the suggestion being based upon the assumption that there is no order of appeal in favor of defendants.
The motion and order relied on by defendants read as follows:
“On motion of Hall, Monroe & Lemann, of counsel for the New Orleans & Northeastern Railroad Company and the Southern Railway Company, and on suggesting that a final judgment was rendered herein against both of these defendants,-in solido, on the 15th of November, 1910, the said judgment having been signed on the 21st of November, 1910, that movers are advised that there is error in said judgment to their prejudice, and that they desire to appeal therefrom, suspensively, it is ordered that, upon compliance with the requirements of law, they be granted a suspensive appeal from the said judgment, returnable to the Supreme Court of Louisiana on the 20th day of December, 1910.”
The bond was given by the defendants, and contains the recital that the appeal was taken by them; but the same thing might have been said of the bond in the matter of Voelkel v. Succession of Aurich, 118 La. 525, 43 South. 151, in which, however, the appeal was dismissed, because, in order to sustain an appeal, there must be an order as well as a bond, and the court was of opinion that the order there relied on could not be construed as an order in favor of any one having an appealable interest. In the case at bar we are of opinion that the order, though badly expressed, may be construed as an order in favor of the defendants, represented, for the purposes of the application, by their counsel.
Thus the applicants appear as counsel for the New Orleans & Northeastern Railroad Company and the Southern Railway Company, “and suggest” that a final judgment has been “rendered agamst both of these defendants, * * * that movers are advised that there is error in the said judgment to their prejudice, and that they desire to appeal therefrom. * * * ” As there are no other defendants in the case in which the motion was filed than the two companies, there can be no doubt that the words “these defendants” refer to said companies. The *628 movers, therefore, appearing as the counsel of the companies, suggest that a judgment has been rendered against the companies, and, having made that suggestion,, they, still as counsel of the companies, represent that they are advised that there is error in said .judgment “to their prejudice, and that they desire to appeal therefrom.”
The question then is: To which antecedents do the pronouns “their” and “they” apply? It had already been stated that the judgment complained of had been rendered against the companies, not against the counsel who were appearing in their behalf, and, notwithstanding the confusing, and perhaps ungrammatical, use of the pronouns, their obvious purpose is to designate the parties previously mentioned, in whose behalf the movers appeared, who alone were condemned by the judgment, who alone were complaining of it, and who alone were interested in appealing. In the ease of Voelkel v. Succession of Aurich, supra, the motion and order were so framed that the “movers” alone expressed themselves aggrieved .by the judgment, alleged to have been, rendered against them from which they alone prayed for an appeal. This case falls rather within the rulings made in the cases of Kraeutler v. Bank, 12 Rob. 458, and Ansley v. Stuart, 123 La. 334, 48 South. 953, and the appeal is sustained.