JAPHET & COMPANY v. SOUTHERN
RAILWAY COMPANY

———

(October 21, 1927. Opinion and Decree.)
(November 28, 1927. Rehearing Refused.)

———

*(Syllabus by the Court)*

1. **Louisiana Digest—Carriers of Passengers and Goods—Par. 135.**

Where property is destroyed by fire while in the custody of a railroad company, to be relieved from liability the carrier must prove that it exercised due care.

2. **Louisiana Digest—Carriers of Passengers and Goods—Par. 135, 136.**

Where the evidence shows that railway company failed to exercise due care in protecting the property of plaintiff from fire caused by a rioting mob, there must be judgment for plaintiff.

Appeal from Civil District Court. Division "D." Hon. Porter Parker, Judge.

Action by Japhet and Company against Southern Railway Co.

There was judgment for defendant and plaintiff appealed.

Judgment reversed.

Merrick, Schwarz, Guste, Barnett, and Redman, of New Orleans, attorneys for plaintiff, appellant.

Hall, Monroe and Lemann, of New Orleans, attorneys for defendant, appellee.

JONES, J. This suit was filed on November 7, 1918, for one thousand two hundred two and 58/100 ($1202.58) dollars, the value of ten (10) barrels of whiskey shipped on June 29, 1917, from Louisville, Kentucky, over defendant railroad to plaintiff in Houston, Texas, but never delivered.

Plaintiff alleges that the whiskey was destroyed in East St. Louis, Illinois, on July 2, 1917, while in the custody of defendant and that the destruction was due solely to the negligence of the carrier. Plaintiff attached to the petition and made part thereof the bill of lading on which the shipment was made.

Defendant answered admitting the shipment and its destruction, but denying negligence.

The following defense is specially pleaded:

"Your respondent denies that the destruction of this shipment was due to any negligence, or fault, or want of care of your respondents or its agents, servants and employees, but avers and alleges that the said shipment and the said C. R. I. & P. car No. 40508 in which same was contained was destroyed by fire in a race riot in E. St. Louis, Ill.; which occurred on the night of July 2nd and morning of July 3rd, 1917; the said car containing the said shipment being then located in what is known as Sixth and Broadway Freight Yards of the Southern Railway Company at East St. Louis, Ill.

"That your respondent company used every effort as a carrier and all care and diligence to protect said car and to remove same from danger, but notwithstanding the said efforts, the said car and its entire contents were destroyed, and for which destruction, under Section I of the Bill of Lading or contract under which this shipment moved, your respondent is not liable; and your respondent specifically sets up, as a defense herein, the said bill of lading or contract of shipment, and particularly Section I thereof."

The record contains a stipulation of fact signed by both attorneys to the effect that the bill of lading under which the ship-

ment moved was the standard bill of lading duly approved by the Interstate Commerce Commission and contained in the tariffs and schedules on file with said commission and that under the provision of said tariff a choice of rates was offered the shipper, whereby he might have obtained unlimited liability from the carrier by paying a higher rate.   ·

The clause in the bill of lading relied upon by defendant reads as follows: "Except in case of negligence of the carrier or party in possession (and the burden of proving freedom from such negligence shall be on the carrier or party in possession) the carrier or party in possession shall not be liable for loss, damage or delay occurring while the property is stopped and held in transit upon request of the shipper, owner or party entitled to make such request, or resulting from a vice or defect in the property or from riots or strikes."

About 270 pages of testimony were taken by commission in East St. Louis as to the conditions existing during the day of the fire and as to the steps that were taken by defendant to save this property.

There was judgment below in favor of defendant and the sole question before us is whether the defendant has proved that he exercised such care in protecting the property as an ordinarily prudent man would have done under similar circumstances.

The evidence shows the following:
On July 1, 1917, a race riot broke out in East St. Louis, Illinois, continuing throughout that day and the next; on the 2nd the danger became so great that a contingent of the State Militia was sent to East St. Louis, Illinois, but apparently did nothing to ameliorate the situation; conditions steadily grew worse in the after-

noon and looked worse still for the night, as the police were doing practically nothing while the fire was spreading. The avowed purpose of the mobs was destruction of the negroes and the burning of their residences. This purpose was generally known throughout the city, and one or two witnesses who resided near sections occupied by the negroes made efforts late that afternoon to move their household effects to preserve them from the anticipated conflagration. A similar riot had occurred on May 29th when a couple of houses had been burned near the L. & N. tracks and the mob had thrown bricks through windows of a negro boarding house just across from 6th Street yard.

The first fire of the day started about four-thirty or five p. m. at the plant of the International Harvester Company, which is located about one block from the northwest corner of the 6th Street yard, very close to the outbound freight house.

The second fire started about five-thirty or six p. m. at the corner of Rockroad and Railroad Ave., less than one hundred feet from their railroad yard in the district inhabited by negroes called "The Black Valley." This fire extended up Rockroad as far as Walnut Avenue across Walnut up 8th Street and back to the railroad yards. The blueprint of the yard shows that the main line of the Southern Railway runs a little north of the 6th Street yard which extends over three (3) squares from 4th Street to 8th Street, containing six tracks, numbered from North to South, 3 to 8 consecutively, track No. 8 being on the southern edge and track No. 3 the farthest north, just south of the outbound freight house.

Most of the cars destroyed were about the middle of the yards on tracks 7 and 8 between 5th and 6th Streets. That night

about one hundred cars were on the different tracks, the yard being nearly full and of these twenty-six cars were burned.

The fire which destroyed this whiskey broke out just South of the 6th Street yard between seven and eight p. m. and by eight o'clock was already burning the cars on tracks 7 and 8.

Bennett, Southern Railway engine foreman, who pulled the cars from tracks 7 and 8, says that he received a telephone message from yardmaster Fritz about seven-fifteen p. m. that the fire was close to their 6th Street yard. He was at the main yard of the company, called Coapman Yard, three or four miles away; he started with his engine and crew, stopped at interlocking plant and sent word to a man that worked the West End Yard that he should come; he then went on to the V. C. junction and side tracked his caboose; as he could not get into the yard at that time on West leg of Y on account of cars burning on track 3, he went back to 10th Street and came down on East leg of Y; he first took about eighteen or twenty cars off track 7 and then fifteen or sixteen off track 8; the fire coming from the North was already burning cars on tracks 3 and 4 when he reached the yard about eight p. m. (forty minutes after he received the telephone message); it would have been impossible to get another engine until he moved four or five cars away; that the regular assigned engine for the 6th Street yard got back while he' was moving cars from tracks 7 and 8 and he told them to move the cars already placed by him on main line further out, so he could have room for another cut; that after getting cars out he saw they had hose on Rock Road.

It is not shown where the regular 6th Street engine was or why it was not on hand promptly.

Meanwhile the regular yardmaster Fritz had gone home at the usual time, also the freight agent, Coffee. Neither of these officials considered there was any unusual danger, although Coffee had been to a conference that afternoon with other railroad agents and had actually been at the outbound freight house that afternoon when a "scattering of boys and girls" (as he mockingly described the mob) tried to enter the building. However, they both testify that they telephoned to various foremen to move the cars.

The absence of the yardmaster Fritz seems all the more remarkable, as Tom Hughes, the regular night yardmaster, was excused that night on account of his wife's death and at six-forty-five p. m. Sweitzer, foreman of the 6th Street engine, had been appointed night yardmaster.

Sweitzer's testimony may be summarized as follows: There was smoke coming from a fire about three blocks above the I. C. depot when he reported for work about five forty-five p. m. at the 6th Street yard; that he left there at six-fifteen with his engine and crew for the Denverside yard and when he arrived there about six forty-five was appointed night yardmaster; at seven-ten he took his engine up to 10th Street for the bill clerk and when he reached 10th Street about seven-fifteen p. m. he saw the fire just south of the 6th Street yard.

He describes it then as follows:

"It looked like those houses were burning, bunch of negro shacks, and it looked as though they were all afire at the time."

Then some rioters stopped him for a while, but he finally went back to Denverside Yard and met Bennett coming out of the West End Yard and told him to move the cars out of the 6th Street Y; a block farther, he met the 6th Street crew and gave them the same instructions; he

remained at the yardmaster's office and Bennett phoned about nine o'clock that they had moved all the cars they could and he told Bennett to go elsewhere; that sixty-five or seventy cars were moved out and there were no other employees of the road in the yard, except the engine crews; that no efforts were made to place any guards around the freight house or standing cars and he knew of no efforts to put any hose on the burning cars; if cars in yard had been coupled they could have been moved in thirty minutes, if not, they could have been moved in sixty to ninety minutes.

Manion, locomotive engineer, says he got his engine from roundhouse about six p. m. and went down to Coapman Yard for his crew, but none was there; that Sweitzer came in about six-thirty and asked him to take him down to 10th Street for bill clerk, as no street cars were running, that they went to 10th Street when Sweitzer said "the fire looks like it is near 6th Street yard;" that he could do nothing because he had no crew; that he went back to Coapman yard and waited, but no crew came that night; that on the way back about seven-forty or seven-fifty they met Bennett, and Sweitzer gave him orders.

Captain Johnson of the fire department says about forty-four cars caught from the fire in "The Black Valley," just north of the yard and were burning by eight o'clock. The outbound freight house was saved by the fire department and if the cars had been moved from the yard or even from the vicinity of the colored district, he thought they would have been safe. He stayed there for thirteen hours and couldn't tell how many houses were burned; all railroad companies have their own hose and water, but he had observed no such precautions that night.

Thomas, vice-president of the Hill Thomas Lime & Cement Company, whose plant was partly destroyed, left home at six p. m., as soon as he got word of the fire and he and all the officers of the company worked to save their property; all their houses were saved by their stable-men and a couple of drivers.

Coffee, the freight agent, testified they had hose connections at the inbound freight house, but only water barrels and pails at the outbound; that so far as he knew the fire might have been burning near the 6th Street yard when he went home at seven o'clock, but he saw no evidence of it.

Several citizens living near the yards assisted in dragging the hose to protect a car tagged "inflammables" from the fire that afternoon between six and eight, but no employee of the defendant road made any effort to get hose or water.

The above digest of the testimony of the principal witnesses confirms the fixed impression first gained from a careful reading of the entire evidence, that the defendant company was negligent both before and after the fire reached tracks 7 and 8 and justifies the following conclusions:

The defendant's agents knew of the rioting, and the serious conditions prevailing throughout the city, particularly in the neighborhood of their own yards, and that the animosity of the mobs was directed against the negroes. They also knew that alongside of their Sixth Street yards was a row of negro residences known at the time, because of the occupants, as the "Black Valley." They knew that negro houses a block away from their yards had been set on fire between 4:30 and 5:00 o'clock, and that negroes were being mal-treated and killed wherever found, but nothing was done by the defendant company, its agents or employees, until after

the fire had been actually communicated to this property.

That no extra precautions of any kind whatsoever were taken to protect the defendant company's property or the property of shippers in its possession in the Sixth Street yards; that all employees (except the negroes), and particularly those holding higher positions, left their work as usual; that no one was asked to remain and, in short, absolutely nothing was done to cope with the situation which had already developed, or to be ready to deal with emergencies which should have been anticipated in view of the whole situation throughout the city, and particularly in the vicinity of the railroad yards.

The Sixth Street yard, during this time, was congested with cars on from six to eight tracks, and the only way, according to the testimony of defendant's witnesses, that these cars could be moved out of that yard was over single Y switch; as the tracks were so laid that only one engine could work at removing cars from the yards.

These yards were not equipped with any fire apparatus or even hose, and had no water connections in the yards adaptable to fire purposes.

There was not a single employee of the defendant company who made any attempt to assist the fire department, though one or two men living in the vicinity were rendering such assistance to prevent the explosion of inflammables.

The identical situation presented in this case has been passed upon by the Court of Appeal of Kentucky in the case of Southern Railway Company vs. Barbee & Co., 226 S. W. 376. The opinion of the Court reads in part as follows:

"Notwithstanding this, the railway company seems not to have taken any precaution whatever, at least none out of the ordinary, to protect the consignment of freight which is the subject of this litigation, nor in fact any freight of which there was a great quantity then in its custody in its yards in the mob-stricken city. While there may have been a few watchmen in their several yards about East St. Louis, no extra precaution commensurate with the fire situation and the imminent danger from the mob was exercised by the railway company, or its employes in charge of the yards, for the protection of the consignment of freight in litigation, or any freight in the custody of the railroad in said yards. In fact it appears from the evidence that the railroad officials in charge of the yards and whose duty it was to look after the safety of the freight therein left their posts of duty early in the evening and went to their homes without having made any special arrangements or effort to inform themselves of the progress of the fires or the threatened danger to the other freight in the yards, from the mob, although the rioting, shooting and burning was going on very near the Sixth Street railway yards of the company, in which this particular consignment was at the time, and in which large quantities of other freight was also standing. Some of the houses burned were within a few feet of the railroad tracks on which loaded cars were standing. This district was largely occupied by colored residents, the object of the mob, and it was common knowledge that the mob was attempting to kill the negroes and destroy their property, and in fact had been for hours burning their houses and the houses in which they lived.

"The railroad employees in charge of the yards were charged with the duty of protecting the freight consigned therein. In other words, if the railway company, by the exercise of ordinary care, could have saved the freight consignment from the fire after its danger from the fire was discovered, but failed to do so, it cannot be relieved of responsibility by showing that mob started the fire. It was charged with 'the duty of exercising ordinary care to save the freight consignment after the fire which threatened its destruction was discovered. If it failed in its duty in this

regard it is liable. The accepted rule is that a railroad company may contract against liability for loss of goods while in transit through mobs or riots, but it cannot contract against its own negligence, and, although a fire may be started by a mob, the railroad company is not relieved of liability by merely showing that the fire was started by a mob, if the facts are sufficient to show, as in this case, that there was ample time between the starting of the fire and the destruction of the property in which the freight might, by the exercise of ordinary care on the part of the railroad company, have been removed from the danger zone to a safe place. For the purposes of this case, we might wholly disregard the fact that the mob started the fire. It is conceded that the fury of the mob was not in any degree directed toward the destruction of the freight cars or their contents, but only towards the shacks near the tracks in which the negroes lived."

In these statements we heartily concur.

Attorney for defendant urges that we should follow the decision of the U. S. Circuit Court of Appeals in the case of Simmons Hardware Co. vs. Southern Railway Company, 279 Fed. 929, rather than the case above cited, because the shipment was interstate and the bill of lading governed by the Federal law.

Although this case grew out of the same fire, we cannot accept this argument of the learned attorney as conclusive, because the assignment of error urged before the U. S. Circuit Court was based on the refusal of the Court to give a certain special charge to the jury, as requested by plaintiff. The Federal Court held that the refused special charge had been substantially covered in the other charges and therefore refused to grant a new trial. In other words, this Court took the facts as found by the jury in the lower court and merely considered the legal question as to burden of proof of negligence.

We consider the law of the case settled in this state by the Supreme Court in the case of National Rice Milling Co. vs. N. O. & N. E. R. R. Co., 132 La. 615, 61 So. 708, in which the facts were closely similar to those involved at present. In that case two cars of rice had been burnt in the yards of the Southern Railway in Hamburg, S. C., the fire having been caused by the flood of the Savannah River reaching and igniting a car of unslacked lime in the same train with the cars of rice. Again the railroad pleaded due care and urged that federal decisions should be followed, because an interstate bill of lading was involved, but the Supreme Court decided in favor of plaintiff, using in part the following words:

"According to law and the jurisprudence of this State, to be relieved from liability the carrier must prove that the loss or damage has been occasioned by accidental or uncontrollable event, and this involves the proposition that the carrier must prove that it was free from fault." National Rice Milling Co. vs. N. O. & N. E. R. R. Co., 132 La. 615, 61 So. 708.

A writ of error from this decision was granted to the U. S. Supreme Court, but the writ was dismissed after full hearing. See N. O. & N. W. Railroad Co. vs. National Rice Milling Co., 239 U. S. 80.

For above reasons the judgment is reversed and it is now ordered, adjudged and decreed that there be judgment in favor of plaintiff, Japhet & Company, Inc., and against the Southern Railway Company in the sum of one thousand two hundred two and 58/100 ($1202.58) dollars, with legal interest from November 7, 1918, and all costs.