COMPANIA DE VAPORES INSCO, S.A., The Baloise Marine Insurance Co., Ltd., The Chrysler Corporation, Compania Importadora de Autos y Camiones, S.A., and Compania de Autos y Transportes, S.A., Appellants,

v.

MISSOURI PACIFIC RAILROAD COMPANY, Guy A. Thompson, Trustee, Missouri Pacific Railroad Company and Texas Pacific-Missouri Pacific Terminal Railroad of New Orleans, Appellees.

No. 15770.

United States Court of Appeals Fifth Circuit.

April 20, 1956.

Rehearing Denied May 28, 1956.

Benjamin W. Yancey, New Orleans, La., Terriberry, Young, Rault, & Carroll, Edward S. Bagley, New Orleans, La., of counsel, for appellants.

C. Ellis Henican, Leonard B. Levy, Kalford K. Miazza, New Orleans, La., Dufour, St. Paul, Levy & Marx, Miazza & Drury, Henican, James & Cleveland, New Orleans, La., of counsel, for appellee.

Before HUTCHESON, Chief Judge, and RIVES and CAMERON, Circuit Judges.

RIVES, Circuit Judge.

This appeal is taken from the district court's judgment exonerating appellees, as common carriers, from any liability for damage to 150 Chrysler Corporation

automobiles, owned and insured by appellants, which had been shipped from Detroit, Michigan, to Westwego, Louisiana, and were being stored "on free time" in appellees' Westwego warehouses awaiting export by ocean carrier to Cuba on April 4, 1952, when a severe windstorm struck the area, causing very extensive damage to the warehouses and the cars stored within.

The ultimate factual issue of whether the damage to the shipment was caused by an "act of God", within the provision of the bill of lading exempting appellee-carriers from liability,[1] was tried to the district court, sitting without a jury, and the court relieved appellees from liability upon subsidiary findings that (1) the April 4, 1952 weather disturbance was either "a small tornado" or a "line squall with tornadic characteristics", and was not the type disturbance which builders and architects "usually antici-

pate" in the design and construction of buildings in this area, and (2) the warehouses were in "reasonably good condition" prior to the storm and a "reasonably prudent inspection" revealed no "apparent deterioration", so that there was no negligent maintenance of the warehouse facilities by appellees contributing to the damage which would justify the recovery sought.[2]

Appellants have invoked our duty of an extensive and laborious factual review by candid assertions that any "fair reading" of this voluminous record will reveal the trial court's findings as "clearly erroneous", and will prompt our reversal upon a "definite and firm conviction that a mistake has been committed", within the rule of McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20, and United States v. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746. In effect, they insist that the trial court,

---

1. That provision reads:
 "No carrier * * * shall be liable for any loss * * * or damage * * * or delay caused by the act of God," etc.

2. Specifically, the court concluded from these and other subsidiary findings in pertinent part as follows:
 "Where damage to a shipment is caused by an Act of God, the carrier is excused thereby from liability for the loss, unless the carrier is concurrently negligent. Memphis & C. R. Co. v. Reeves, 10 Wall. 176, 77 U.S. 176, 19 L.Ed. 909.
 "A tornado or a line squall with tornadic characteristics (such as the weather disturbance, the proof of which was established in this case) is to be classed among the Acts of God which no human power can prevent or avert. Mistrot-Callahan Co. v. Missouri, K. & T. Railroad Co. of Texas, Tex.Civ.App., 209 S.W. 775; Western Millers Mut. Fire Ins. Co. v. Thompson, D.C., 95 F.Supp. 993, 997.
 "Where a carrier proves, by a preponderance of evidence, that an alleged loss resulted from an Act of God (such as the weather disturbance that occurred in this case) and the evidence further shows that the carrier was in no way negligent, the carrier is not liable for the said loss. Memphis & Charleston Railroad Co. v. Reeves, 10 Wall. 176, 19 L.Ed. 909; Morrison v. Davis, 20 Pa. 171; Denny Co. v. New York Cent. R. Co., 13 Gray 481.

"After the establishment of the defense of an Act of God, the carrier has the burden of proceeding by establishing by a preponderance of the evidence the absence of any negligence on its part which might have contributed to the occurrence of the loss or damage. East Tennessee, V. & G. R. Co. v. Johnston, 75 Ala. 596; Agnew v. The Contra Costa, 27 Cal. 425; McGrath v. Northern P. R. Co., 121 Minn. 258, 141 N.W. 164, L.R.A.1915D, 644.

"The defendants in this case have proved to the satisfaction of this Court that at the time of the aforementioned weather disturbance the warehouses of the TP–MP Terminal were sound, and that the condition of the warehouses did not in any wise contribute to the damage to or destruction of the said warehouses by the severe wind which struck them on the morning of April 4, 1952. Accordingly, the defense of an Act of God, namely, the wind disturbance that defendants proved to have occurred was the proximate and sole cause of the damage to or destruction of plaintiffs' automobiles, trucks and accessories.

"Consequently, the defendants are excused from their failure to have delivered the said automobiles, trucks and accessories in the same good order in which they were received at the point of shipment."

while acknowledging the guiding principles, has failed in their application to the instant proof to exact that high obligation from common carriers to safeguard property entrusted to their care which the authorities require.

Appellees insist, however, that any disturbance of the judgment would be inapropos, because appellants admittedly do no attack the rule relied upon;[3] and the contested findings, making due allowance for the trial court's credibility advantage in resolving conflicting testimony, are amply supported by the proof.

 We agree with appellants and the district court that appellees, in order to exonerate themselves from liability for the damage, were required to prove not only that the "line squall" constituted an "act of God" within the exemption from liability provision of their bill of lading, but also that they were guilty of no negligence in the construction and maintenance of the warehouses which contributed to causing the damage.[4] For by its very definition, an "act of God" implies "an entire exclusion of all human agency" from causing the loss or damage.[5] Both parties rely mainly upon Louisiana decisions as controlling, appellants as supporting their contention that appellees had the burden of proof throughout, while appellees interpret them as requiring exoneration upon proof of an "act of God" within the exemptive proviso of their bill of lading.[6] We think it unnecessary, however, for us to resolve this asserted conflict in local law, for notwithstanding any contrary language in the Supreme Court of Louisiana's opinion in the National Rice Milling Co. case, supra, it seems to us that the issue of which party properly has the burden of proof to sustain a recovery under this federal statute, Carmack Amendment, Title 49 U.S.C.A. § 20 (11), is governed by federal law, rather than by any state rule purporting to fix the onus of proof.[7]

 As heretofore stated, however, we think appellees were properly charged with the burden of proof throughout,[8]

---

3. Indeed, appellees insist that the trial court's conclusions of law, heretofore quoted in footnote (2), were more favorable to appellants than they should have been, in that they actually placed a greater burden upon them than they were required to discharge under the law. Specifically, they contend that, after making their prima facie showing below that the weather disturbance causing the damage constituted an "act of God" within the exemptive provision of their bill of lading, the burden should then have been placed upon appellants to establish that the warehouses were inadequate and negligently maintained, which proof appellees assert appellants failed to introduce.

4. See Texas & Gulf S.S. Co. v. Parker, 5 Cir., 263 F. 864, 868; Chicago & E. I. R. Co. v. Collins Produce Co., 7 Cir., 235 F. 857, 863; The Schickshinny, D.C., 45 F.Supp. 813, 817–818; Cf. American Sugar Ref. Co. v. Illinois C. R. Co., D.C., 103 F.Supp. 280, 286.

5. 9 Am.Jur., Carriers, § 708, p. 850 et seq.; 13 C.J.S., Carriers, § 80, p. 159.

6. Appellants cite Article 2754 of the LSA–Revised Civil Code, National Rice Milling Co. v. New Orleans & N. E. R. Co., 132 La. 615, 652, 61 So. 708; and Lehman Stern & Co. v. Morgan's L. & T. R. & S. S. Co., 115 La. 1, 8, 38 So. 873, 70 L.R.A. 562.

 Appellees seek to distinguish the National Rice Milling Co. case, supra, as inapplicable on the question of burden of proof, and rely upon American Cotton Co-operative Ass'n v. New Orleans & Vicksburg Packet Co., 180 La. 836, 157 So. 733; E. Borneman & Co. v. New Orleans M. & C. R. Co., 145 La. 150, 81 So. 882.

7. Southern Express Co. v. Byers, 240 U.S. 612, 614, 36 S.Ct. 410, 60 L.Ed. 825; Southern Ry. Co. v. Prescott, 240 U.S. 632, 640, 36 S.Ct. 469, 60 L.Ed. 836; Chicago & Northwestern Ry. Co. v. Davenport, 5 Cir., 205 F.2d 589; Thompson v. James G. McCarrick Co., 5 Cir., 205 F.2d 897, 900; Delphi Frosted Foods Corp. v. Illinois Cent. R. Co., 6 Cir., 188 F.2d 343.

8. Possibly the district court was correct in stating to counsel during a colloquy upon this issue below that the conflicting and inconsistent language of the decisions stems from the use by many courts of the phrase, "burden of proof", in lieu of the more precise phrase, "burden of going forward with the evidence."

but in any event we regard this inquiry as purely academic upon this record, for decision here does not turn upon the burden of proof, but upon whether the record as a whole supports the district court's finding that appellees were free from negligence contributing to cause the damage, or whether that finding should be reversed as "clearly erroneous."

Almost any inclemency of weather causing property damage is an "act of God," in a limited sense, so that the problem is not solved by simply relying upon the conflicting testimony of experts as to whether this particular disturbance should technically be characterized as a "line squall", or "line squall with tornadic characteristics." From a realistic standpoint, we think decision in this type controversy should turn not upon technical, meteorological definitions, but upon the issue of whether the disturbance causing the damage, by whatever term it is described, is of such unanticipated force and severity as would fairly preclude charging a carrier with responsibility for damage occasioned by its failure to guard against it in the protection of property committed to its custody.

Thus far, this Court is substantially in agreement with the district court as to the controlling principles involved. The majority, however, are convinced that this record presents for review only a routine factual dispute, in which the district court's acceptance of that portion of the proof tending to support its conclusion that the damage resulted solely from an act of God, within the exemption from liability provision of the bill of lading, and without contributing fault upon appellees' part, is not reversible as "clearly erroneous." Rule 52(a), Fed.

Rules Civ.Proc., 28 U.S.C.A. Judge Rives is convinced that the more credible and convincing proof fails to show this weather disturbance was of such unanticipated and uncommon force and severity for the New Orleans area as would justify exonerating appellees, with their high obligation as common carriers toward protection of property in their custody, from liability based upon their contributing fault through the inadequate construction and negligent maintenance of these warehouse facilities prior to the storm, which he thinks is revealed by the testimony and particularly by the photographic proof. He would, therefore, reverse the district court's findings exonerating appellees from liability in this instance as "clearly erroneous."[9]

In view of the majority conclusion, the judgment is

Affirmed.

## APPENDIX

Appellees' weather expert, Nash C. Roberts, Jr., testified, in part, that there was a definite relationship between the formation of line squalls, thunderstorms, and tornadoes, all these weather disturbances being precipitated by unstable atmospheric conditions; that tornadoes or cyclones are generally considered extreme low pressure systems with a counterclockwise rotation, and often reach a velocity of 300 or 400 miles per hour; that "line squalls" are composed of a series of thunderstorms of severe velocity and often have tornadic potential, though a "line squall" and "a tornado", meteorologically speaking, are not the same; that "line squalls" usually have wind velocity of less than 75 miles per hour, though occasionally a severe line squall will get up to from 90 to 120 miles per hour, whereas tornadic velocity

9. We consider it unnecessary to amplify this divergency in the Court's view by any extended analysis of the expert testimony as to the technical difference between line squalls, tornadoes, hurricanes, and the definition within which this particular disturbance is more appropriately embraced, from the conflicting testimony as to the damage and aftermath indicia recounted at such length at the trial. Excerpts of the material testimony, both as to the severity of the disturbance and the construction and maintenance of appellees' warehouses, are hereinafter separately abstracted as an appendix to this opinion.

has been recorded as high as 500 or 600 miles per hour; that he recalled the weather disturbance on April 4, 1952, and had heard at that time the "characteristic roar that is associated with tornadoes"; that he inspected the damage the following morning near the Huey Long Bridge and considered it "devastating", and characteristically similar to that caused by a tornado, leaving a path "roughly a mile wide * * * that was terribly damaged"; that he considered the line squall as displaying "tornadic characteristics" because there was evidence of counterclockwise rotation from the fact that the Gretna radio station tower was somewhat twisted and bent, and the debris from the Huey Long Bridge was also "rolled" to some degree; and in addition there was evidence of "skipping" along its path; that taking all factors into consideration, he had reached the conclusion that the maximum velocity of the wind in the direct path of damage actually exceeded 100 miles per hour; that (on cross-examination) he understood the Weather Bureau of New Orleans had "officially classified this ('52 disturbance) as a (line) squall and not * * * a tornado", and that its report stated that it did not cut a path "in the sense a tornado cuts a path", but that he did not agree with the report for the reasons previously stated, viz.: because of the extensive damage within a well defined one mile area, with some evidence of counterclockwise rotation, explosive damage, sharp dips and rapid rises on barographs not even in direct path of damage, etc.; that he knew that the weather report was made by a climatologist after making an investigation, but that he entertained a different professional opinion from that weather bureau employee (Mr. Ralph Sanders) as to the severity of the storm, which he considered as exhibiting "tornadic characteristics", as evidenced by "skipping" and other indicia previously summarized.

Appellants, meteorologist, Alfred H. Glenn, gave contrary testimony to the effect that the damage was caused by "a severe line squall" with velocity "in the vicinity of 90 to 100 miles per hour", and he saw no evidence whatsoever of tornadic winds; that wind velocity in a tornado exceeds that in a line squall considerably, a tornado's velocity ranging between 300 and 800 miles per hour and the velocity of a "line squall" only infrequently attaining 100 miles per hour; that the maximum wind velocity of the April, 1952, disturbance, as recorded on the Huey Long Bridge anemometer was 91 miles per hour, which might vary "plus or minus 20%" from the wind velocity at the damaged area on the Westwego wharf; that he neither saw, nor do the weather bureau reports show, any reliable evidence of tornadic rotation, "skipping", or explosive damage which would justify characterizing the storm as a tornado, and in his opinion the photographic exhibits did not justify any such conclusion; that this April, 1952, storm was of approximately the same velocity and severity of previous hurricane winds experienced in the New Orleans area of from 92–100 miles per hour, and he felt the weather bureau had properly characterized this disturbance officially as a "line squall"; that at about 100 M.P.H. velocity any wind would have a "roar" or hum to it, not necessarily identifying it as a tornado; and that the path of damage was not any conclusive evidence that a tornado occurred, since tornadoes describe various paths, some of which are erratic, and a "line squall" itself will exhibit strong gusts of wind, successive increases and decreases in wind velocity, etc., and he felt the weather bureau report, stating that the path of damage "was not indicative of a tornado", was justified.

Typical of the defensive testimony, offered by appellees to negative appellants' contentions as to the faulty construction and deterioration of these warehouses, is that introduced through their witnesses, Huey, Lytle and Pennybaker. Huey testified that the warehouses were of a type construction frequently encountered in the New Orleans area, and though he found the usual evidences of decay therein (such as some dry rot,

etc.), such partial deterioration was not uncommon in that locality for that class and type structure, and did not prohibit its adequacy to withstand the usual "heavy windstorms" normally experienced in that area; that (on cross-examination) the warehouse buildings did provide some rigidity of resistance to west winds, the direction from which the storm came, in that they had "knee braces" for each vertical post, i. e. 4 x 4 "knee braces" to each post; that the vertical reinforcing posts in the warehouses were "toenailed to the flooring" and were not secured with bolts or in any other way except for the diagonal "knee braces"; that the uprights and studs, etc. were also "toenailed", and the sills were nailed to the floor, with the walls of the warehouses constructed from corrugated iron.

Lytle testified that he could not remember how long before the storm he had made a wharf inspection, but his maintenance crew had been on the wharf the day before; that, in his opinion, the wharf was in "good condition" before the storm, and he did not know of any "dry rot" or "termite damage" to the "superstructure", though there was always some deterioration to the substructure, i. e. beneath the floor, which caused a "continuous maintenance problem", but this portion of the warehouses was not damaged by this storm; that some additional anchorages and fastenings have been added in the reconstruction of the wharf since the April, 1952, storm, in that the two rows of posts on both sides have been bolted to the caps in the substructure, and Teco fasteners have been added at the top of the column, which changes should make it more secure and improve it considerably, but that its construction at the time of the storm did not render it "weak and insecure", it then being "in good shape to stand a fairly severe windstorm" of about "90 miles an hour"; that "as much as 80%" of the $8,000 per month average allotment for wharf and warehouse maintenance was expended for repairs to the wharf's substructure, rather than for maintenance of the roof and shed where the actual damage occurred.

Pennybaker testified that, from his one or two inspections for a period of from six months to a year before the storm, he found the wharf "generally in good condition"; that some posts showed evidences of decay, but they were generally spliced or replaced, and there was some deterioration to the substructure which was corrected as it developed and the decking (flooring) had failed from time to time due to decay or excess loading, at which time it was replaced, so that he would say that about the time of the storm the wharf was in a state of "about 75%" good condition or repair. On cross-examination, the witness refused to acknowledge that he knew of any instances where the warehouse posts actually came loose and hung free without fastening, but admitted that occasionally they were hit by trailers or stevedoring tractors, and some of them did show partial dry rot or decay at the bottom, but these were very few and were being replaced "as rapidly as possible"; that all the warehouses were typically "light mill type construction."

Among appellants' main witnesses were the elder McKee and Blessey. McKee testified that he had had some previous experience observing the decayed condition of these same warehouses from having been employed to survey great quantities of flour which had become badly infested by weevils and moths there in 1947 and 1951, and had then checked the wharves for evidences of infestation which might have originated in them and caused the damage to the flour shipments; that deterioration (i. e. dry rot, decayed timber, holes in the walls, etc.) was "very prevalent" and many of the posts which were supposed to hold the roof of the wharf up were either not straight or had been knocked out of line; and that the color slides and photographs taken by his son, showing misalignment of posts, holes in the walls, rotted and decayed conditions, etc., in his opinion, were "representative of the condition of the wharf before the storm."

Blessey testified that he had made a study of the structure and the design of the Westwego warehouses, with particular reference to their ability to withstand this severe type west-to-east wind at the time of the April, 1952, storm; that the warehouse type structure was normally considered a "temporary structure" with its corrugated walls, inadequate nailing, etc.; and that he considered the warehouses designed as exhibiting a "temporary structure" because "toenailing" was considered inadequate design for "permanent type structures", and with holes in the walls and dry, rotted timber its resistance to winds of "significant" velocity was further reduced, especially its resistance to crosswise winds; that (on cross-examination) his computations were based on the assumption that the warehouses were new structures, i. e. in good state of repair, and with that assumption he applied a 100 M.P.H. wind stress to it, which would pull out the nails and knee braces, the critical spots in its design; and, in fact, at that wind velocity the nails would be loaded up to three or four times their normal stress resistance.

Rehearing denied: RIVES, Circuit Judge, dissenting.