(59 South. 42.)

No. 18,796.

WHITEHURST v. TEXAS & P. RY. CO.

(June 13, 1912.)

*(Syllabus by Editorial Staff.)*

1. CARRIERS (§ 115*)—FREIGHT—ACCRUAL OF LIABILITY.

A railroad company is liable for cotton burned on a freight platform at a station where no agent was maintained, where the shipment could have been received on a local freight train which passed the day before the fire, but which did not stop through failure of an agent to give an order.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 501–507; Dec. Dig. § 115.*]

2. CARRIERS (§ 155*)—FREIGHT—ORDERS OF RAILROAD COMMISSION—EFFECT.

The State Railroad Commission has no jurisdiction over the contractual relations of carriers and shippers, that being a matter on which the Legislature alone can legislate, and a clause in a bill of lading, the form of which was adopted on an order of the commission, in conflict with the general principles of law, is not binding upon a shipper not shown to have expressly or impliedly consented to be bound by such clause.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 677, 679, 682–685, 691–696; Dec. Dig. § 155.*]

3. CARRIERS (§ 10*)—STATE RAILROAD COMMISSION—POWERS.

Const. art. 284, which authorizes the State Railroad Commission to govern and regulate railroad freight and passenger tariffs and service, merely gives the commission power to see that proper service is rendered, and does not transfer from the Legislature to the commission legislative powers.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 12, 14–20; Dec. Dig. § 10.*]

Appeal from First Judicial District Court, Parish of Caddo; E. W. Sutherlin, Judge.

Action by Sawdea Whitehurst against the Texas & Pacific Railway Company. Judgment for defendant, and plaintiff appeals. Affirmed.

Wise, Randolph & Rendall, for appellant. Hall & Jack, for appellee.

PROVOSTY, J. [1] Plaintiff sues for the value of 54 bales of cotton that were destroyed by fire while on the platform at Cecile station, one of the stations of the branch road of the defendant company, awaiting transportation to Shreveport. The station was not one at which there was an agent; but the custom, or usual course of business, was to put freight upon this platform for shipment, and give notice of its presence there to the agent at the neighboring station of Caspiana, some three miles off. Plaintiff had given this notice, and the agent had promised to take the proper measures in the premises.

Only two freight trains were operated on this branch road, and only one of them (called the "Local") would stop to take on freight or to pick up loaded cars. It went down, or south, one day, and returned north to Shreveport on the next day; or, vice ver-

sa, went up to Shreveport one day, and returned south the next. The other train (known as the "Through Freight") passed twice daily, once up and once down. It did not stop for way freight or to pick up loaded cars, but, when necessary, would drop empty cars at way stations as needed.

This cotton, which, as already stated, was to go to Shreveport, or north, was brought to the station on a Friday, after the local train going north, or to Shreveport, had already passed. Some time in the ensuing night the through freight train going down, or south, dropped two empty cars at Cecile station to receive the cotton.

The custom was that, when more than eight bales were to be loaded, the loading was done by the shipper, and not by the train crew. Accordingly, on that Saturday morning the plaintiff's five grown sons went to the station to load the cotton on the cars. But they found that the cars had been left too far from the platform for this to be done. Thereupon one of them went at once and informed the local merchant near by, Mr. Knight (who, we gather, had some interest in the cotton), of the improper placing of the cars, and Mr. Knight told him to go at once and notify the agent at Caspiana. Mr. Knight and the plaintiff saw the young man start off on this errand. The young man testifies that he went directly to the agent, and gave him the notice; and that he returned to Cecile station, and awaited there the coming of the local train, due to pass that day, in the expectation that it would stop and locate the cars properly. The local train passed without stopping, owing to the failure of the agent to give it the order to stop; and the cotton remained on the platform at the station. During the ensuing night, it perished—set fire to, we think, by sparks from the locomotive of the through freight train going north, or towards Shreveport. It was the night of the 31st of December, and several colored men, returning in the small hours of the morning from celebrating the birth of the New Year, saw the engine emitting sparks as it passed by the platform, and one of the men saw some of the sparks falling upon the cotton.

Although it was early in the morning, at about sunrise, when the young men went to the station to load the cotton, and one of them was sent to Caspiana to notify the agent of the misplacement of the cars, and it was after 12 o'clock when the local train passed, the agent testifies that the notification was given him after the local train had passed; and therefore too late for him to order it to stop and locate the cars properly. His testimony on that point is in opposition to that of the young man who was sent to notify him; and, in a manner, to that of Mr. Knight and plaintiff, who saw the young man start off on his errand early in the morning, in more than ample time to have given the notice long before 12 o'clock, since the distance was only three miles; and also to that of one of the brothers, who testified that his brother returned to Cecile and there awaited with him and the other brothers the coming of the local train.

And since the object of giving this notice was to get the train to stop, it is not probable that the young man delayed giving it until the train had passed.

In June, 1908, the State Railroad Commission adopted, and enjoined upon the railroads for intrastate traffic the use of, a standard bill of lading, and defendant uses no other; and therefore, if the cotton had been put on board of the cars and a bill of lading had been issued, it would have been in that form. Said bill of lading contains the following clause:

"Property destined to or taken from a station, wharf or landing, at which there is no regularly appointed agent, shall be entirely at the risk of owner after unloading from cars or vessels or until loaded into cars or vessels, and when received from or delivered on private or other

sidings, wharfs, or landings shall be at owner's risk until the cars are attached and after they are detached from the trains."

Whether the attention of plaintiff had been called to this clause in the bills of lading issued by the defendant company, or whether he was aware that for freight put upon its platforms to be taken up in due course of business the defendant company would not assume responsibility except as stipulated in that bill of lading, the record does not show.

Plaintiff contends that defendant is liable for the value of this cotton because its responsibility as a common carrier had attached; and that, if not as a carrier, the defendant company is at any rate liable as a tort-feasor for having negligently set fire to the cotton.

Defendant, on the other hand, contends that, under the general principles of the law of carriers, a carrier is not liable until the freight has passed out of the control and custody of the shipper and under that of the carrier; and that at a station where there is no agent this shifting of control and custody does not take place until the freight has been actually taken aboard a train; or, if it has been put in a detached car, then, not until the car has been actually attached to a train.

In the case of Meyer v. V. S. & P. R. R. Co., 41 La. Ann. 639, 6 South. 218, 17 Am. St. Rep. 408, which is not to be distinguished in its facts from the present case, this court held that the responsibility of the carrier began the moment that it became its duty to take charge of the freight in due course of business; and that this was by the next train, unless for good reasons shown this was not possible.

[2, 3] That decision must be held to be conclusive of the present case, unless the above-transcribed clause of the bill of lading can make a difference.

We must hold that it cannot.

If, under general principles of law, the defendant company is liable, the regulations of the Railroad Commission cannot release that liability. Or, in other words, the Railroad Commission has no jurisdiction over the contractual relations of carriers and shippers. That is a matter upon which the Legislature alone is competent to legislate. When article 284 of the Constitution speaks of the Railroad Commission having power "to govern and regulate railroad freight and passenger tariffs and service," it evidently means no more than that the commission shall have power to see to it that a proper service is rendered. There is no intention to transfer from the Legislature to the commission the whole legislative powers with reference to railroads, or the whole legislative power for the regulation of the relations between shipper and carrier.

Said clause of the bill of lading therefore is not to be accorded the force and effect of a legislative enactment; and it is not otherwise binding upon the plaintiff, since there is nothing to show that he ever expressly or impliedly consented to be bound by it, or even had any knowledge of it.

Judgment affirmed.