### No. 2119

### Second Circuit

---

### HARDEE-GLASPIE CO., INC., v. WALLACE & LANCASTER, RECEIVERS T. & P. RAILWAY COMPANY

---

(November 6, 1926.  Opinion and Decree.)
(December 11, 1926.   Rehearing Refused.)

---

#### (Syllabus by the Editor.)

1. **Louisiana Digest—Carriers of Passengers and Goods—Par. 124, 132.**

A common carrier is not liable in damages for the value of a shipment of

goods burned while on its loading platform, if the agent notified the prospective shipper that there was an embargo on the shipment, and that the railroad company could not accept the goods at that time, and no bill of lading was issued.

Appeal from the Twelfth Judicial District Court of Louisiana, parish of De Soto, Hon. John H. Boone, Judge.

Action by Hardee-Glaspie Co., Inc., against C. L. Wallace and J. L. Lancaster as receivers of the Texas & Pacific Railway Company.

There was judgment for plaintiff and defendants appealed.

Judgment reversed.

L. E. Colvin, of Mansfield, attorney for plaintiff, appellee.

Wise, Randolph, Randolph & Freyer, of Shreveport, attorneys for defendants, appellants.

ODOM, J.  Plaintiff sues for the value of cotton which was destroyed by fire while on defendants' cotton platform at Pleasant Hill or Sodus, Louisiana.

Plaintiff alleged that the defendants, as receivers, operating the Texas & Pacific railroad, maintained a station for receiving and discharging freight and a duly authorized station agent at Pleasant Hill or Sodus, Louisiana, and that on October 5, 1922, it delivered to the defendants certain cotton to be shipped—

"* * * said delivery being effected by petitioner carrying said cotton to the station platform of the defendants at said Sodus station and depositing the same thereon, with the knowledge and consent of the said defendants, their agents and employees, all in accordance with the custom prevailing among the shippers at said station."

And, in paragraph seventh—

"That no objection was made by the said defendants, or their agents and employees in charge of their business at said station, to the depositing and placing of said cotton on said platform; but on the contrary, the same was done with their consent and approval and in accordance with the custom previously prevailing, fostered and approved by the defendants, their agents and employees."

It further alleged that on the night following the day on which the cotton was so deposited it was destroyed by fire.

Defendants especially deny, in answer, that they received the cotton for shipment as alleged by plaintiff, and especially allege that at 2:55 p. m., on the day previous to the day on which said cotton is alleged to have been so delivered there was an embargo laid on the shipment of cotton to Shreveport, Louisiana, where plaintiff alleged the cotton was to be shipped, and that plaintiff knew of said embargo at the time it alleges it deposited the cotton on the platform for shipment.

There was judgment in the District Court for plaintiff as prayed for and defendants have appealed.

OPINION.

It is well to observe that plaintiff does not seek to hold defendants liable as warehousemen or as bailees but as common carriers.

The lower court, after reviewing the testimony, propounded this interrogatory—

"Had the relation of shipper and carrier begun at the time of the fire, so as to render the carrier liable for the loss sustained?"

And it says—

"The court is of opinion that, owing to the custom prevailing at the station, defendant company had received the cotton for shipment and is liable therefor."

We make these observations to show that plaintiff contended in the lower court as in this that defendants are liable as common carriers.

The testimony shows that the defendants had erected and maintained a platform for the reception of cotton to be shipped over its lines of road, which platform was between the main line and a spur track about 35 or 40 yards from the depot or station; that there was no other cotton platform in the village where cotton could be stored pending shipment; that it had been the custom for 25 years for merchants and others who purchased cotton to have it unloaded from the wagons to said platform; that plaintiff, a merchant, bought cotton during the cotton season and followed that same custom, and that during the afternoon of each day it made out a bill of lading with shipping instructions for the cotton which it had placed on the platform during the day and carried it to the station agent who immediately checked the cotton against the bill of lading and if found correct signed it and delivered it to the shipper.

The testimony further shows that about 2:55 p. m., on October 4, 1922, the station agent was notified by wire that an embargo had been laid upon shipment of cotton to Shreveport during the next 48 hours; that at the time the message was received by the agent, Mr. Barrow, an employee of plaintiff, was then at the station getting a bill of lading for cotton which had been delivered on the platform up to that time and that the agent mentioned the fact of the embargo to him; and while the station agent testified that he told Mr. Barrow at that time that no

more cotton would be received for shipment on account of the embargo, Mr. Barrow testified that something was then said about the embargo but he did not recall what it was.

But regardless of what the station agent told Mr. Barrow on the afternoon of the 4th, it is shown that Mr. Hardee, president and general manager of the plaintiff company, knew on the afternoon of the 4th, the day before the cotton destroyed was placed on the platform, that an embargo was on and that no more cotton would be received for shipment by defendants until the embargo was lifted, as shown by the following testimony given by Mr. Hardee.

"Q. You knew when you placed this cotton on that platform that the agent was not receiving cotton for transportation?

"A. I knew I was not going to get a bill of lading that date, yes, sir.

"Q. And notwithstanding your knowledge of that fact you left it there?

"A. Yes, sir.

"Q. Why did you leave it?

"A. I had no place to put it and I was going to ship it the next day.

"Q. You had no platform of your own?

"A. No, sir.

"Q. You left it for your own convenience?

"A. It was the custom; we put it there always.

"Q. You admit that you had knowledge of the embargo on the afternoon of the 4th?

"A. Yes, sir.

"Q. And you say that when you talked to the agent on the 5th he told you that he could not receive the cotton?

"A. He told me that on the evening of the 4th—yes, sir."

On the 5th of October, the day following the day on which plaintiff was notified

that defendants would receive no more cotton for shipment on account of the 48-hour embargo, the plaintiff placed on the platform the cotton which was destroyed by fire on the morning of the 6th and for which it claimed the defendants are liable as common carriers.

As to whether the station agent did in fact receive this particular cotton, he testified that he knew, in a general way, that cotton was being placed on the platform during that day but that he had no knowledge that plaintiff had placed its cotton there; that plaintiff gave him no notice that it had deposited the cotton on the platform for shipment and gave him no shipping instructions.

Mr. Hardee, testifying in rebuttal, said:

"Well, I think, as Mr. Keene stated on the stand, he knew in a general routine way that the cotton was going on the platform; he did not check it. He knew that it was going on as a general routine proposition but to have known it absolutely, as he stated on the stand, he would have had to check it, but in a general routine way he knew that the cotton was going on the platform."

"Q. He could not help but know that?
"A. No, sir, but he hadn't checked it, I am sure."

There is no intimation that Mr. Hardee, representing the plaintiff, or any of the employees of the plaintiff company told the agent that the cotton was being placed on the platform or that the agent had any actual knowledge of the fact. Mr. Hardee testified, in rebuttal, that he did not notify the agent and ask for a bill of lading because—

"I didn't see as there was any use because he had told us there would not be any cotton shipped in that forty-eight hours. Therefore we didn't present any bill of lading."

And he was asked—

"Did you understand from that that you could not bring it there or that he could not ship it out?

And he answered—

'No, sir, that he could not ship it out."

Our Brother of the District Bench held that under the circumstances above detailed the defendants are liable as common carriers.

We do not understand that counsel for plaintiff contends or that the court intended to hold that a common carrier is bound as such unless and until the goods are received and are at least in the constructive possession of the carrier.

But counsel contend, and it was so held by the District Judge, that due to the fact that defendants had constructed a platform on its tracks for the reception of cotton and that plaintiff had followed the long established custom, sanctioned and acquiesced in by defendants, of carrying its cotton there and placing it upon the platform for shipment there was in fact a delivery of the cotton to defendants and that they are bound as completely as if a bill of lading had been issued.

But, conceding that delivery may be thus made, under some circumstances, and that the carrier's assent thereto may be implied from a course of dealings and a custom long sanctioned, it does not follow that the carrier is bound under the circumstances of this case.

The general rule is that the responsibility of a common carrier for goods intrusted to it commences when there is a complete delivery of the goods for the purpose of immediate shipment. In order that there may be a complete delivery of goods for shipment, the carrier must

give assent thereto and there must be an acceptance of the goods for shipment. But such assent and acceptance need not be in express terms, it may be implied when the goods are left in the usual place in accordance with the custom of the carrier to receive them. But even under such circumstances the carrier is not liable as such unless it has in some way received notice of the presence of the goods on the platform.

In the case at bar, the testimony shows that there was no assent and no acceptance of the delivery by the carriers. They could not and did not acquiesce in the established custom relied upon during the embargo laid against the shipping of cotton to Shreveport and plaintiff was specially so notified. It is not disputed that defendants had a right to refuse to accept cotton for shipment during the embargo.

As soon as the embargo went on the plaintiff was informed that no more cotton would be accepted for shipment until the embargo was lifted. Plaintiff says it received this information from the agent on October 4th. That plaintiff acquiesced in such refusal on the part of defendants is shown by the fact that no bill of lading was requested for the cotton put on the platform on the 5th for Mr. Hardee said—

"I didn't see as there would be any use because he had told us there would not be any cotton shipped in that forty-eight hours."

So that if it be conceded that the defendants, under ordinary circumsances, would be bound by the usage and custom relied upon by plaintiff to establish acceptance of the shipment, it is also true that such custom was specifically set aside during the embargo to the knowledge and with the acquiescence of the shipper.

But plaintiff contends that whereas it is true that it was informed that no more cotton would be shipped out during the embargo, it was not informed that defendants would not receive cotton on its platform for shipment as soon as the embargo was lifted.

But the agent, Mr. Keene, testified that he told Mr. Hardee that defendants would not receive any cotton for shipment, and Mr. Hardee was asked (page 14 of the testimony—

"And you say that when you talked to the agent on the 5th he told you that he could not receive the cotton?"

And he said: .

"He told me that on the evening of the 4th—yes, sir."

The plaintiff, therefore, had knowledge not only that cotton would not be shipped out but that it would not be received for shipment.

Therefore, while it is true, as contended by plaintiff, that the agent did not refuse to permit him to deposit the cotton on the platform on the 5th of October, it knew that the cotton which it placed there on that date was not received and accepted for shipment.

Under such circumstances the defendants could be considered as no more than bailees or warehousemen. But plaintiff does not seek to hold them liable as such.

While the above is a sufficient reason for holding that defendants are not liable, there is an additional reason that even though the cotton was put on the platform by plaintiff something remained to be done by it before the cotton could be forwarded.

See:

6 Cyc. 414.

10 Corpus Juris, 224.

The testimony shows that other shippers had cotton on the same platform at the

time. The plaintiff did not notify defendants' agent of the number of bales it had placed there nor the marks of the bales. There was nothing by which the agent could identify the cotton which plaintiff claims it had placed there. The agent could not ship the cotton if he had been so disposed because he could not identify it; he did not know to whom the cotton was to be shipped; he received no shipping instructions. There was therefore no completed delivery of the cotton. In order for the delivery to be complete the plaintiff had necessarily to give the agent such information as would enable him to ship the cotton.

"Failure to give shipping directions prevents a completed delivery."

See case note under head—

"Delivery to Carrier."

found in 22 A. L. R. 975, et seq., where authorities are cited and reviewed. Many authorities touching the whole subject matter involved in this case are cited in the case note above referred to.

See also, L. R. A. 1916C, 608.

32 L. R. A. (N. S.) 315, et seq.

Counsel for plaintiff, in support of his contention, cites the cases of Whitehurst vs. Texas & Pacific Ry. Co., 131 La. 139, 59 South. 42, and Meyer vs. V. S. & P. Ry. Co., 41 Ann. 639, 6 South. 218.

These cases are easily distinguishable from the case at bar, and do not support plaintiff's contention.

In the Whitehurst case the court found the facts to be that—

"The station was not one at which there was an agent; but the custom, or usual course of business, was to put freight upon this platform for shipment, and give notice of its presence there to the agent, at the neighboring station of Caspiana, some three miles off. Plaintiff had given this notice and the agent had promised to take the proper measures in the premises."

The agent failed, after receiving notice of the presence of the cotton on the platform, to give the proper orders for its removal or protection. The cotton remained on the platform for some time after it should and would have been removed if the agent had given proper orders, and while on the platform was set afire to and burned by sparks from the defendants' locomotive.

The first section of the syllabus on that case reads as follows:

"A railroad company is liable for cotton burned on a freight platform at a station where no agent was maintained, where the shipment could have been received on a local freight train which passed the day before the fire, but which did not stop through failure of an agent to give an order."

In the Meyer case, supra, the facts were similar to those in the Whitehurst case. The cotton was, according to custom, loaded on a platform at a station where no agent was maintained, but the agent at Monroe was notified in writing and by verbal message sent by the conductor that the cotton was there ready for shipment. The plaintiff had a man at the flag station to flag the train and give the necessary shipping instructions:

The court said:

"On Tuesday night a freight train passed, and although flagged, failed to stop. No satisfactory explanation is given of this failure to stop and take the cotton, except that it was a through train which passes at night and does not stop

at the flag stations. Defendant's agent swears, however, and it is not contradicted, that he usually shipped at night. It is not shown that it was not in the power of the defendant company to transport the cotton from the time it was stored until destroyed."

The court found that the carrier departed from its usual custom of taking cotton from this platform by the next freight train which passed after notice of the presence of the cotton thereon.

The court said:

"The liability of the company to plaintiffs in the present case rests solely upon their failure to ship at the proper time."

In the case at bar, the defendants did not fail in their duty. They could not take the cotton for shipment and notified plaintiff to that effect.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be reversed and avoided and that plaintiff's demands be rejected and its suit dismissed at its costs.