LAND, Justice.
 

 Plaintiff firm is a commercial partnership domiciled and doing business at Elm Grove, Bossier parish, and is composed of William I-I. Hodges and Campbell B. Hodges.
 

 Plaintiff has brought the present suit to recover the value of seventy-two bales of cotton weighing 35,910 pounds, worth 18.7 cents per pound, destroyed by a fire in the freight cars of defendant carrier on August 18, 1927, at Elm Grove, La., less 7,240 pounds, worth 9 cents per pound, salvaged from the fire.
 

 Sixteen bales of the seventy-two loaded in the cars belonged to J. L. Hodges, and fifty-
 
 *6
 
 six bales belonged to plaintiff firm, W. H. & O. B. Hodges.
 

 The claim of J. L. Hodges was transferred to W. H. & O. B. Hodges, and the petition by consent amended by stipulation to include the claim-of J. L. Hodges with that of W. H. & C. B. Hodges.
 

 There was judgment in the court below for plaintiff in the sum of $6,126.41, with legal interest from judicial demand, and from the judgment above mentioned defendant has appealed.
 

 The defense is that the cotton was never in the custody of defendant as a common carrier and that its liability as such never attached, and, that if the cotton had been received by defendant for transportation, it would have been received and transported under the provisions of the uniform bill of lading prescribed or indorsed by the Louisiana Public Service Commission, which contains the following clause: “Property • destined to or taken from a station * * * at which there is no regularly appointed freight agent ■ shall he entirely at the risk of the owner after unloaded from cars * * * or until loaded into cars * * *, and, except in case of carriers’ negligence when received or delivered to such stations * * *, shall be at the owner’s risk until the cars are attached to, and after they are detached from the locomotive or train. * * * ”
 

 In August, 1927, defendant company was operating a local freight train from Shreveport to Campti, La., the latter place being a point beyond Elm Grove. This train left ■ Shreveport on Mondays, Wednesdays, and Fridays of each week, going south to Elm Grove and Campti, and returning north to Shreveport from Campti via Elm Grove on Tuesdays, Thursdays, and Saturdays.
 

 We approve the following statement of facts made by the trial judge:
 

 “The proof shows that in the year, 1908, due to a disastrous flood in the Spring of that year, plaintiff firm entered into an agreement with the defendant by the terms of which the agency station at Elm Grove was suspended, with the understanding that plaintiff firm would itself discharge the duties of station agent. Under this arrangement and agreement the method of handling cotton- shipments from Elm- Grove to Shreveport was to have cars required set out by the crew of the-freight train going south one day, which after being loaded and sealed by plaintiff firm, would be picked up by the northbound freight on the next day.
 

 “Bills of lading for such shipments would be made out by the plaintiff firm and handed to the conductor of the train picking up the shipment, or in the Winter time and during rush seasons when the trains were running behind schedule, arriving at Elm Grove at uncertain times of day or night, the bills of lading would be placed in a lock box attached to-the station for the purpose, from which the conductor upon his arrival would take them,, leaving in the box a copy for the shipper.
 

 “This arrangement and custom was followed and carried out with satisfaction to both plaintiff and defendant from the year,. 1908, up to August 18,1927.
 

 “Pursuant to this agreement and custom,, plaintiff on August 16th or 17th requested1 two cars for the shipment of the cotton in.
 
 *8
 
 question to Shreveport. The cars required were duly set out at Elm Grove, loaded with seventy-two bales of cotton and bills of lading covering the shipment were made out by the plaintiff.
 

 “About four o’clock A. M. of August 18th, the cotton was destroyed by fire, with the exception of the 7,240 pounds which was salvaged. The fire occurred before the arrival of the northbound freight train which would have carried it to Shreveport.”
 

 The conductor of the local freight train of defendant company has been in the service of that company for seventeen years. When-asked to explain to the court the practice in regard to picking up cotton at Elm Grove for shipment to Shreveport, he replied: “Well, the custom has been ever since I was running there, if we place cars going South we would naturally suppose that the car was ready as we came North.” Tr., p. 64.
 

 “Q. You expected to pick up these two by the next Northbound train, on your next trip North? A. Expected to, yes.” Tr., pp. 65, 66.
 

 This witness at first stated that he was not told that the cars would be loaded and ready to pick up, when the cars were requested; but, on further examination, he would not swear positively that he was not told, but said that he did not think that he was. Tr., p. 65.
 

 Glover, the gin foreman of plaintiff firm, made a request of the conductor of the freight train to furnish these cars. One of the cars was spotted by the conductor on August 16th, and the other on the morning of August 17th, and the next freight train returning north to Shreveport arrived at Elm Grove in the afternoon of August 18th about 3 or '4 o’clock. .
 

 Glover states positively that he told the conductor of the freight train of defendant company to spot him two cars to be loaded with cotton, and to be picked up by the first freight coming back. Tr., p. 37.
 

 Under this state of facts, we hold that defendant company was notified that the cars would be loaded and ready for shipment on the north-bound freight train that arrived from Campti on the afternoon of August 18th.
 

 Besides, the conductor of the freight train knew from the custom in handling cotton shipments from Elm Grove to Shreveport that these cars would be loaded and ready for shipment at that time.
 

 Under the evidence before us, it cannot be doubted that there was complete delivery to the carrier and acceptance by it in the case.
 

 The cars were set out by the carrier for the particular purpose of having them loaded with cotton by the plaintiff to be picked up and carried to Shreveport the following day. The cars were loaded; they were sealed; the bills of lading were made out by the plaintiff ; and there remained nothing else for the shipper to do, before the shipment should go forward.
 

 The failure of the conductor to lift the bills of lading at plaintiff’s store is immaterial, under the facts as we appreciate them, as such bills added nothing to the binding force of the contract of carriage in this case. The agreement to accept and transport these cars when loaded became a complete acceptance of the shipment when the loading was
 
 *10
 
 finished. St. Louis, I. M. & S. R. Co. v. Murphy, 60 Ark. 333, 30 S. W. 419, 46 Am. St. Rep. 202; Louisville & N. R. Co. v. Edwards’ Adm’x, 183 Ky. 555, 209 S. W. 519; Hines, Director Gen. of Railroads, v. Steele (Tex. Civ. App.) 224 S. W. 606; Pittsburg, C., C. & St. L. R. Co. v. American Tobacco Co., 126 Ky. 582, 104 S. W. 377; Noel Bros. v. T. & P. Ry. Co., 16 La. App. 622, 133 So. 830; Straub et al. v. M. P. R. Co., 170 Ark. 1174, 283 S. W. 36.
 

 In our opinion, there was a complete surrender in this case by plaintiff of possession and custody, and all control over the goods was abandoned by the owner, and the carrier thereby assumed responsibility as such.
 

 (2) It is clear that plaintiff must re-, cover, unless the clause in'the uniform bill of lading, prescribed or indorsed by the Louisiana Public Service Commission, placed the cotton at the risk of the owner until the cars were attached to the locomotive or train.
 

 In Whitehurst v. Texas & P. Ry. Co., 131 La. 139, 59 So. 42, the clause upon which defendant company relies as a defense against its liability was construed, and it was held that the State Railroad Commission has no jurisdiction over the relations of carriers and shippers, that being a matter on which the Legislature alone can legislate, and that a clause in a bill of lading, the form of which was adopted on an order of the commission, in conflict with the general principles of law, is not binding upon a shipper not shown to have expressly or impliedly consented to be bound by such clause.
 

 It was further held that article 284 of the state Constitution, which authorizes the State Railroad Commission to govern and regulate railroad freight and passenger tariffs and service, merely gives the commission power to see that proper service is rendered, and does not transfer from the Legislature to the commission legislative powers.
 

 In the Whitehurst Case, fifty-four bales of cotton were destroyed by fire while on the platform at Cecile station, awaiting transportation to Shreveport. The station was not one at which there was an agent; but the custom, or usual course of business, was to put freight on this platform for shipment, and give notice of its presence there to the agent at the neighboring station at Caspiana, some three miles off. Plaintiff in that case had given this notice and the agent had promised to take the proper measures in the premises, but failed to do so.
 

 In the Whitehurst Case, 131 La. 143, 59 So. 42, 43, it is said: “In the ease of Meyer v. V. S. & P. R. R. Co., 41 La. Ann. 639, 6 So. 218, 17 Am. St. Rep. 408, which is not to be distinguished in its facts from the present case, this court held that the responsibility of the carrier began the moment that it became its duty to take charge of the freight in due course of business; and that this was by the next train, unless for good reasons shown this was not possible.
 

 “That decision must be held to be conclusive of the present ease, unless the above-transcribed clause of the bill of lading can make a difference.
 

 “We must hold that it cannot.”
 

 The instant ease differs materially from the Whitehurst Case, in that plaintiff firm is
 
 *12
 
 an agent of defendant company, located permanently at Elm Grove station, and attending daily to shipments of freight.
 

 Plaintiff firm had acted continuously as agent of defendant company for a period of nineteen years, when the cotton in this case was destroyed by fire. During all of these years, plaintiff firm had discharged the duties of a regularly appointed agent at this station, in procuring necessary freight cars for shippers, in loading and sealing sa'me, and in preparing and issuing bills of lading, thereby affording full protection to defendant company as to such shipments.
 

 Under this state of facts, neither the fact that this was an agency without compensation, nor the fact that plaintiff firm was not designated as “a regularly appointed agent” eo nomine, can change the actual status of plaintiff firm in this case, in its relation to defendant company. Plaintiff firm was there as its agent to protect freight and freight shipments, for the benefit of defendant company, and the only reason for the clause in the bill of lading, invoked by that company as to its nonliability in this case, is the absence of an agent at the station to look after its interests.
 

 We hold, therefore, that the clause in the bill of lading under which defendant company seeks to avoid liability does not apply to this case, as we fail to see the distinction between plaintiff firm, as agent for the mere accommodation of defendant company, and “a regularly appointed agent,” when all of the duties of the latter were performed satisfactorily by that firm, as the trusted representative of defendant company, and for its benefit and protection.
 

 In the second place, the record is barren of any evidence to show that the clause in the bill of lading upon which defendant relies was called to the attention of plaintiff firm at any time, or that this firm ever consented to -be bound by it. In the absence of proof that the shipper expressly or impliedly consented to be bound by this clause, such bill of lading, under the Whitehurst Case, is inoperative to prevent recovery.
 

 Finally, the clause has no application under the terms of the shipping agreement and arrangement in force at the Elm Grove station, under which defendant company had always agreed to accept and transport these ears when the loading was finished.
 

 Judgment affirmed.