## SENTELL v. TEXAS & P. RY. CO. *
### No. 5017.

Court of Appeal of Louisiana. Second Circuit.

May 2, 1935.

---

*Rehearing denied June 4, 1935.

See, also, 146 So. 352; 146 So. 353.

L. Percy Garrot, of Shreveport, for appellant.

Wise, Randolph, Rendall & Freyer and J. N. Marcantel, all of Shreveport, for appellee.

TALIAFERRO, Judge.

Plaintiff sues to recover the loss sustained by him on account of the burning of 50 bales of his cotton after being loaded by his employees into two of defendant's cars, which had been "spotted" by defendant's train on a spur track that connects plaintiff's gin with defendant's main line three miles south of Dixie in Caddo parish.

The cars were left on the spur at plaintiff's request November 12, 1931, and were loaded the following evening by 5 o'clock. There were 29 bales in one car and 21 bales in the other. The cars had been closed but not sealed. Both cars were discovered wrapped in flames about 11 o'clock p. m. The fire was evidently incendiary, but there is no evidence whatever in the record pointing to the identity of the guilty party.

It is conceded that the defendant was not given any notice that the cars had been loaded, that no bill of lading had issued on the cars, and that no shipping instructions had been given it. It is further admitted that no train passed on the main line between the time the cotton was loaded and the time of the fire. Defendant exercised no act of control or possession of the cars after being loaded, and therefore no actual delivery or acceptance of same was made to or by it. If plaintiff has recourse against defendant to retrieve his loss, it must be held there was a constructive delivery to defendant, as alleged by plaintiff, pursuant to a well-established custom following shipping transactions between them for many years. The custom relied on by plaintiff is this: That, when "spotted" cars are loaded at the spur track, they are hauled by defendant's north-bound trains to and left on its side track at Dixie, and thereafterwards hauled to Shreveport by its south-bound trains; that this often takes place upon the request of petitioner, though no shipping instructions have been given, and though no bills of lading have been issued: that, due to the fact that there is no railroad agent at defendant's spur, this is a custom that has always been followed relative to cars loaded at the gin on this spur, and is a custom well recognized and followed by defendant. Anent this alleged custom it is further averred:

"Eleventh. That when goods and commodities are shipped by John M. Sentell, Sr., from Sentell's Spur, bills of lading are prepared by him; that these are then presented to the agent at Shreveport, La., for his signature; that said bills of lading are always executed by said agent without further formality, and without investigation or inquiry; that goods and commodities belonging to petitioner are often shipped or moved by the Texas & Pacific Railway Company before said bills of lading are issued, and upon a simple request, and without specific shipping instructions; that this custom has prevailed at Sentell's Spur for many years; that many times loaded cars are moved by defendant before even a request to move them is made by petitioner; and that this is a custom that has likewise prevailed for many years.

"Twelfth. That according to a custom that has prevailed for many years at Sentell's Spur, and by and between your petitioner and the Texas & Pacific Railway Company, goods and commodities loaded for shipment at Sentell's Spur are considered as delivered to the Texas & Pacific Railway Company as soon as said goods and commodities are loaded, and before bills of lading have been issued, and before specific shipping instructions have been given, and before a request that said goods and commodities be moved has been made; and that according to said custom none of these things must be done before there is delivery to said company.

"Thirteenth. That this custom prevailed before said cotton was destroyed by fire, and at the time of its destruction; that it is still

prevailing; that since said fire several loaded cars have been moved from Sentell's Spur before the issuance of bills of lading, before shipping instructions had been given, and before a request had been made that they be moved; and that in one of these instances a car of cotton seed was moved to Shreveport, La., before it had even been sold, and before your petitioner knew to whom it would be sold and delivered.

"Fourteenth. That in the present case, due to the fact that it was five o'clock p. m. before the said cotton had been completely loaded, and before said cars had been closed and prepared for shipment, it was impossible to request that said cars be moved, or to give shipping instructions, or to secure the execution of bills of lading before the next day, November 14th, 1931; that even though said request had been made, or said instructions given, or said bills of lading had been issued, it would have been impossible for said Texas & Pacific Railway Company to have moved said cars before the fire occurred due to the fact that the train going to Shreveport, La., does not pass Sentell's Spur until several hours after the time at which the fire occurred; and that it is impossible to request conductors of freight trains passing through Dixie, La., to move cars, or to give them shipping instructions due to the fact that all of said trains pass this point during the late hours of the night, this being impossible unless someone is left at Sentell's Spur to meet said trains.

"Fifteenth. That due to the fact that the Texas & Pacific Railway Company always moves cars loaded at Sentell's Spur to the siding in Dixie, La., and even to Shreveport, La., when requested to do so, and without before requiring shipping instructions, or the execution of bills of lading, and often before any communication whatsoever from your petitioner to the defendant, the communication of said instructions, or the execution of said bills of lading is a mere formality; and that delivery to the Texas & Pacific Railway Company takes place though this formality has not been complied with.

"Sixteenth. That the cotton of your petitioner having been delivered to the Texas & Pacific Railway Company in the manner hereinabove outlined, and the same being in the possession of the said company before the above mentioned fire, the Texas & Pacific Railway Company is liable unto your petitioner in the full sum of $1,384.13, with legal interest thereon from November 13th, 1931 until paid, and all costs of suit."

Defendant denies liability to plaintiff and denies all the allegations of fact which form the basis of plaintiff's suit, excepting that it does admit the cotton was loaded into its cars by plaintiff and that it was practically destroyed by fire of unknown origin, as alleged. It is specially denied that there was any sort of delivery of the cotton to defendant and that the loading of the cars had been completed. Other defensive averments are set out in the answer and a special defense urged, but the conclusion reached by us on the issue of delivery vel non obviates necessity of comment thereon.

Plaintiff's demands were rejected by the lower court, and he appealed.

This is the second suit instituted by plaintiff to recover for the loss of the cotton. (La. App.) 146 So. 352. In the first suit the petition was dismissed on an exception of no cause of action because it did not disclose facts deemed sufficient to constitute a delivery of the cotton into defendant's possession. The defects of the first petition were sought to be corrected in this, the second suit.

Article 2754 of the Civil Code provides: "Carriers and waterman are liable for the loss or damage of the things entrusted to their care, unless they can prove that such loss or damage has been occasioned by accidental and uncontrollable events."

Therefore, to fix responsibility on defendant for plaintiff's losses, it must be disclosed that the cotton was "entrusted" to its care within the meaning of this article of the Code as construed by the courts of the state.

It appears that plaintiff's gin had a breakdown the evening the cotton was loaded into the cars. This was all the cotton plaintiff had at the gin, and he intended shipping it to a cotton factor in the city of Shreveport some miles south of the gin. We think the testimony sustains the contention that the loading had been completed. One car was filled to capacity; the other one could have accommodated a few more bales.

It also appears that, as a rule, each evening after cotton was loaded into cars delivered by defendant, plaintiff would drive down to its office in Shreveport and there make out bills of lading covering all the cotton, and these were promptly signed by defendant's agent when presented to him. The cotton was then, as a rule, hauled by one of defendant's north-bound local freight trains to the side track at Dixie, three miles north of the gin, and was allowed to remain there until a south-bound train coupled to

the cars and hauled them to Shreveport. It is also disclosed that occasionally, during the busy ginning season, defendant would "spot" empty cars on the spur, without request, and without definite instructions would attach any loaded cars there at the time and haul them to the side track at Dixie. This was done for reasons of convenience and economy and to make room for other cars on the spur. It was not done invariably. The practice was allowed evidently because plaintiff's habit of securing bills of lading each evening was well known to its trainmen and servants.

As to the practice between the parties, plaintiff testified:

"Q. Now, Mr. Sentell, what is the custom that prevails at Sentell Spur concerning loaded cars? A. Well, as I said, the custom is that they are loaded sometime during the day and I bring the loading list to Shreveport, loading sheet, they make out bills of lading here in the office and are signed here, that is the custom."

After mentioning one specific instance of defendant's trainmen moving a car of cotton seed to Shreveport without bill of lading or shipping instructions, subsequent to the burning of the cotton in question, he further testified, viz.:

"Q. Have they been following that custom for the last few years? A. For the past several years they have picked up loaded cars could not tell specific instances, but just usual they do it and pull them up to Dixie.

"Q. I am not asking for specific instances, I asked if it is often done? A. Well, I would not say often, it is frequently done.

"Q. In other words, loaded cars are frequently moved by the Texas & Pacific Railway Company from Sentell's Spur without being requested to do so, without shipping instructions and before bills of lading are issued? A. Yes. * * *

"Q. Did the railroad officials know where that cotton was to go? A. All cotton over that line came to Shreveport.

"Q. They hauled it without any request or without any shipping instructions? A. I presume so, they knew it was coming to Shreveport.

"Q. How long has the custom of moving cars without any request on your part, or shipping instructions prevailed? A. I believe it has prevailed for twelve or fifteen years—it was thoroughly understood between them when cars were loaded they pulled them out—I have always had the most amicable relations with the T & P, never any question about it, never. * * *

"Q. Did you ever request them to move the cotton? A. Occasionally I have, the night watchman after the cars were loaded tell the trainmen the cars were loaded, they pulled them out.

"Q. That frequently? A. That was done when shipping was heavy have to have cars in pretty rapidly, tried to get them out as fast as loaded.

"Q. Did you ever give them shipping instructions? A. No, they just pulled the loaded cars out.

"Q. They knew where they were going? A. All coming to Shreveport, and would be billed later.

"Q. Frequently they moved cars away from Sentell's Spur without being requested to do so, without shipping instructions and before bills of lading are issued? A. Yes, they have done that for the past several years as I recall."

W. C. Sentell, plaintiff's son, who operated the gin for several years, does not, in all respects, corroborate plaintiff's evidence as to the uniformity of the practice referred to. He says:

"Q. Do you know if that is the practice there at this gin? A. Well, they have done it.

"Q. How long has that been going on? A. Well, I could not say. I just run the gin at times, I think I have run the gin five years all together.

"Q. You know they have been following that practice? A. They were when I run the gin. * * *

"Q. How often did they do that? A. Well, would not do it so often because the cars usually always billed out—they go out there, maybe stop the train, place in empties.

"Q. When they brought empties there would they always take away the loaded cars? A. If the cars were loaded at the time.

"Q. They always did that? A. Generally, always took them away.

"Q. No matter if they were not notified to do so? A. They always generally would be notified to take them away, some of us would be at the gin, tell the boys."

■ This testimony does not, as contended by plaintiff, establish a uniform rule or custom or tacit understanding between him and defendant that cotton, as soon as loaded in-

to cars on the spur, was "considered as delivered" to defendant, when no bill of lading had issued or shipping instructions had been given. It does establish that, as alleged by plaintiff, "often," "many times," and "frequently," defendant would haul loaded cars from the gin to its siding at Dixie to await issuance of bills of lading or shipping instructions. Custom is defined by article 3 of the Civil Code as follows: "Customs result from a long series of actions constantly repeated, which have by such repetition, and by uninterrupted acquiescence, acquired the force of a tacit and common consent."

The facts of the present case take it out of this definition.

It is inconceivable that a rule should prevail in business of this kind out of which a railway company would take possession of loaded cars and route them without having some instructions, by bill of lading or otherwise, as to their ultimate destination. The practice between the parties, as reflected from the testimony, was simply this: That defendant had the right to haul loaded cars from the gin switch to the side track at Dixie, there to await issuance of bill of lading in the manner herein stated. This did not mean that the loaded cars were constructively in defendant's possession and at its risk as soon as loaded, without any notice whatever being given it of the situation. The spur was on plaintiff's premises, and the cotton was under his control until burned. If he had desired to remove it from the cars, he had the right to do so, as they had not been sealed, and, until he had lost dominion and control of it, certainly there could be no delivery to defendant. Of course, had defendant hauled the cotton to Dixie and it had burned there before bills of lading were issued, a different case would confront us. It would have been, in such circumstances, entirely out of the possession of the owner and under complete control of defendant, and at its risk.

Plaintiff cites and relies upon the following decisions of our own courts: V. & A. Meyer & Co. v. Vicksburg S. & P. Ry. Co., 41 La. Ann. 639, 6 So. 218, 17 Am. St. Rep. 408; Scott v. Sample, 148 La. 627, 87 So. 478; Whitehurst v. Texas & Pac. Ry. Co., 131 La. 139, 59 So. 42; Noel Bros. v. Texas & Pac. Ry. Co., 16 La. App. 622, 623, 133 So. 830; Harris Hyman & Co. v. La. R. & Nav. Co., 4 La. App. 381; Hodges v. La. Ry. & Nav. Co., 180 La. 3, 156 So. 26.

In the Meyer Case the cotton destroyed by fire had been placed on defendant's plat-form, erected for the purpose of storing freight thereon while awaiting shipment, under the promise of defendant's agent to ship same by next train. The promise was not kept. Fire was communicated to the cotton from defendant's passing train. It was held liable for the loss.

In the second, or Scott Case, suit was not against a railway company, but against the owner of the gin at which the destroyed cotton was ginned. It can have no application to the present case.

The third, or Whitehurst Case, so far as may be deemed pertinent to the case at bar, involved loss from burning of cotton on the railway company's platform, which was not picked up by its train because of the failure of the agent to give an order for its shipment.

In the fourth, or Noel Case, a bill of lading had issued before the cotton was destroyed. Therefore defendant acknowledged delivery of the cotton to it and assumed all the burdens on it as carrier, created by law, necessary to its preservation from loss.

The Harris Hyman Case supports the defense in the present case. Recovery was not allowed because the cotton had not been loaded into defendant's cars on the spur for the purpose. It was required of the shipper, as a fixed rule, that he load the cotton before a bill of lading would issue.

In the Hodges Case a bill of lading had issued.

In each of these cases, contrary to the facts of the present one, the railway company's agent had actual knowledge that the cotton had been deposited on its premises or in its cars ready for shipment.

Touching the question of delivery to carriers, 4 Ruling Case Law, 693, contains this very lucid and pertinent comment, viz.: "Where a shipper undertakes to load goods on cars furnished or to be furnished him for that purpose by a carrier, the exact moment when the delivery is complete and the carrier's liability attaches is not always easy of determination. As a result, the cases in which the question has arisen do not display an entire unanimity of opinion on the point. In general, however, it may be stated that where goods are placed for shipment in a car which is left standing on a side track by a carrier for that purpose, and the railroad company is notified of such loading, a constructive delivery to the latter takes place, eo instante, without any further act on the part of the shipper being necessary."

Of course, if there is a well-known and observed usage or custom to the effect that the loaded goods, from time of loading, are in the carrier's possession, and therefore at its risk, even if no actual notice is given it, the rule quoted above does not apply; but in this case we hold that the practice by defendant of occasionally hauling loaded cars from defendant's spur to Dixie, without shipping instructions, or before issuance of bills of lading, did not amount to usage or custom, as defined by our law. Civ. Code, art. 1966. The practice was not of such habitual and uniform nature as to warrant plaintiff in the belief that a delivery had been made of the cotton to defendant.

We are of the opinion that the judgment appealed from is correct, and it is hereby affirmed.