AMERICAN SUGAR REFINING CO. et al.
v. ILLINOIS CENT. R. CO.
Civ. A. No. 2414.

United States District Court
E. D. Louisiana, New Orleans Division.
March 7, 1952.

Deutsch, Kerrigan & Stiles, Rene H. Himel, Jr., New Orleans, La., for plaintiff.

Lemle & Kelleher, Charles Kohlmeyer, Jr., New Orleans, La., for defendant.

WRIGHT, District Judge.

Plaintiff in this action was the owner of a shipment of 54,000 bags of raw Puerto Rican sugar which, after being unloaded off the Steamship Morning Light at New Orleans, was placed in the defendant's wharfhouse known as Stuyvesant Dock prior to its being conveyed by the defendant to plaintiff's refinery at Arabi, Louisiana. While the shipment was stored in Stuyvesant Dock a hurricane struck the City of New Orleans and damaged part of the shipment. The intervenors are underwriters who have indemnified the plaintiff for its loss and have been subrogated to its rights. The defense of the carrier is Act of God.

### Findings of Fact.

1. Plaintiff, American Sugar Refining Company, is a corporation incorporated under the laws of the State of New Jersey. Intervenor, The Home Insurance Company, is a corporation incorporated under the laws of the State of New York. Intervenor, Insurance Company of North America, is a corporation incorporated under the laws of the State of Pennsylvania. Intervenor, St. Paul Fire & Marine Insurance Company is a corporation incorporated under the laws of the State of Minnesota. Defendant, Illinois Central Railroad Company, is a corporation incorporated under the laws of the State of Illinois.

2. At all material times, defendant was engaged in business as a common carrier of merchandise in Louisiana, and maintained, owned and operated, in connection with its carriage of merchandise, certain covered wharfhouses, known as the Stuyvesant Docks, along the Mississippi River in the Parish of Orleans.

3. In August or September, 1947, defendant agreed to receive at the Stuyvesant Docks, to load into railroad freight cars, and to transport and deliver to plaintiff's refinery at Arabi, Louisiana, all of the sugar consigned to plaintiff which was to arrive in New Orleans shortly thereafter aboard the Steamship Morning Light.

4. On or about September 16, 1947, the Steamship Morning Light arrived in New Orleans, and on September 16–18, 1947, 54,000 bags of Puerto Rican raw sugar and 95 bags of ship sweepings consigned to plaintiff were discharged into wharfhouses 3 and 4 of the Stuyvestant Docks. Said sugar was delivered into said wharfhouses, pursuant to prior notice to defendant of such delivery, for transportation by defendant to plaintiff's refinery at Arabi, Louisiana, at defendant's earliest convenience and without further instructions from plaintiff. No rain fell during the discharge.

5. Each of said wharfhouses is about 500 feet long from end to end (paralleling the river), about 110 feet wide from land side to river side, and has an 18–23 foot ceiling. At the time in suit, the landward and riverward sides of each of said wharfhouses were each closed by 25 canvas curtains, hung between concrete posts which could be rolled up when not in use. Each of said curtains was about 20′ 6″ wide and overlapped either post between which it was hung by 3 inches when hanging straight down. Some of said curtains were 8 feet long, or high, and some were 12 feet high. Some of said curtains, when completely unrolled, reached only to about 12′ 4″ from the floor. Said curtains could not be fastened or secured at the sides in any manner, and could be fastened only at 3 points along the bottom.

6. As defendant's agents at the Stuyvesant Docks were aware, said curtains were habitually bellied in, and rainwater driven under and alongside them into the wharfhouses, during squalls. For this reason it was defendant's custom, when squalls arose, to cover cargo in the wharfhouses with tarpaulins, which were kept in a ware-

house 500 feet away, and which measured, some 8′ by 20′ 6″, and some 12′ by 20′ 6″.

7. The bags of raw sugar in suit were tallied and weighed as they came off the steamship, and were sampled in the wharfhouses. Subsequently, at least 5 per cent. of the emptied bags were weighed and the average tare calculated; and the samples were reduced and polarized by buyer, seller and the New York Sugar Trade Laboratory, and the polarization results settled according to standard practices in the sugar trade. The weight of the entire shipment upon discharge into defendant's wharfhouses was:

|  | Gross | Net |
|---|---|---|
| Cargo | 13,522,776 lbs. | 13,394,650 lbs. |
| Ship sweepings | 23,816 lbs. | 21,927 lbs. |

The average sucrose content of the entire shipment upon discharge into defendant's wharfhouses was 96.85909 per cent.

8. The discharge of the raw sugar into the wharfhouses was completed about 5 P. M. on September 18. About 2 P. M. on the same afternoon, the United States Weather Bureau in New Orleans communicated to defendant a warning that a hurricane was expected to strike southeast Louisiana the following day. Before leaving the Stuyvesant Docks on the afternoon of September 18, both of defendant's executive agents there knew that a hurricane had been forecast to strike New Orleans the following day.

9. Said executive agents, as well as all of defendant's dock workmen, left the Stuyvesant Docks promptly at 5 P. M. on September 18, as usual. None of the workmen were asked to remain overtime. No other workmen were asked to report to the Stuyvesant Docks for night duty.

10. During the night of September 18–19, the Stuyvesant Docks, as usual, were entirely devoid of men charged with protecting from the elements goods in the wharfhouses awaiting transportation. As usual, the only personnel in the area were four patrolmen whose duty was to guard against thieves and fire, and whose sole duty, with respect to protection of goods in the wharfhouses against the elements, was to telephone the superintendent of the Stuyvesant Docks at his home in the event of bad weather; the superintendent would then get up, get dressed, contact dock workmen by telephone, proceed to the Stuyvesant Docks (5 to 7 minutes' distance from his home), sometimes, on his way, awaken railroad workmen who slept in cars near the Stuyvesant Docks, and be ready to cope with an emergency with sufficient manpower at about half an hour after being notified of it.

11. Although it began raining at about 10 P. M. on the night of September 18–19, and although the wind velocity rose steadily from 3 P. M. on September 18 to about 70 miles per hour at 6:30 A. M. on September 19, the patrolmen failed to call the superintendent during the night. No dock workmen were called to, or did, report to the wharfhouses during the night.

12. Since the wharfhouses were lighted, if workmen had been present, a line of tarpaulins could, during the night, have been spread over the stacked sugar nearest the landward and riverward sides of the wharfhouses and anchored at the base of the stacked sugar with timbers. A second line of tarpaulins could have been spread over the sugar directly behind the sugar covered by the first line of tarpaulins, and anchored by wedging the outer corners of the tarpaulins between or under stacked bags of sugar. Similarly, a third line of tarpaulins could have been spread and anchored, and the sugar thus covered to a distance of at least 20 feet back from the curtains. Since the wind-driven rains subsequently swept about 20 feet into the wharfhouses, all or most of the wetting caused by the rain would have been averted had tarpaulins been placed over the sugar in time.

13. Defendant could have commenced loading the sugar into cars as it was discharged onto the wharfhouses, or promptly after completion of the discharge into the wharfhouses, but did not do so. Cars to receive the sugar arrived some time during the night of September 18–19. There was no showing by defendant that the cars could not have been ordered earlier. Since each car holds about 420 bags, and 17 cars can be loaded from wharfhouses 3 and 4 in two hours, over 28,000 bags could have been loaded between 2 P. M. (when defendant

received the storm warning) and 10 P. M. (when the first rain fell) on September 18. Had loading commenced at 5 P. M. after completion of the discharge from the steamship, over 17,000 bags could have been loaded before 10 P. M. Since the cars were substantially watertight, all or most of the subsequent wetting of the bags nearest the landward curtains (which were the bags worst affected by the ensuing storm) would have been averted had the loading been done in time.

14. As the sugar lay in the wharfhouses, it was stacked 4 bags (about 4 feet) high and was interspersed by four 4.5-foot fire aisles running from landward to riverward sides. Men with handtrucks (which were available) could have moved bags nearest the curtains back through the fire aisles, and laid them atop the interior bags. Special motorized sugar-loading cranes maintained at the Stuyvesant Docks could have been utilized to facilitate and hasten this operation. Had the operation been commenced promptly after completion of the discharge from the steamship, a substantial number of exposed bags near the curtains could have been moved back out of danger and the ensuing rain damage materially reduced if not altogether prevented.

15. The superintendent of the Stuyvesant Docks awoke, as usual, at 6 A. M. on September 19. Although he lives at only 5 to 7 minutes' distance from the wharfhouses, and although it was raining heavily and the wind velocity was then 65 miles per hour, he did not arrive at the wharfhouses until 7:15, his normal time of arrival in rainy weather, and only 15 minutes earlier than his usual time of arrival in fine weather.

16. The dock foreman arrived at 6:30 A. M. on September 19, as usual. Although it was raining heavily and the wind velocity was then 70 miles per hour, he made no effort to call the workmen sleeping in cars near the wharfhouses to begin putting out tarpaulins or moving the exposed bags to safety. At 7 A. M., as usual, a contingent of "sweepers" reported for duty. Five appeared in place of the usual seven. No effort was made to replace the missing men. With 5 men at his disposal, the foreman made no effort to secure tarpaulins or to move exposed bags to safety.

17. When the superintendent arrived at 7:15 A. M. he made no effort to call the workmen sleeping in cars near the wharfhouses or to obtain extra men from any other source. He did not order tarpaulins to be secured, or exposed bags to be moved to safety. The sweepers were set to tightening the curtain moorings, which had been blown slack by the wind. Between 7:15 and 8 A. M. the wind velocity increased from 75 to 80 miles per hour, and it continued to rain heavily, but no effort was made to secure tarpaulins, to move exposed bags to safety, or to obtain additional workmen.

18. At 7:55 A. M., the day crew of dock workmen arrived, as usual. Only 33 men of a normal crew of 75 appeared. No effort was made to replace the missing men or to secure extra men. Five valuable minutes were taken up with the customary roll call.

19. At about this time, the wharfhouse curtains began to belly, split and break loose from their lashings in the wind, and rain began pouring into the wharfhouses onto the sugar. The dock workmen finally set out to obtain tarpaulins. The first tarpaulins were spread over the sugar at 8:15 or 8:20 A. M. when the wind velocity was about 80 miles per hour.

20. Owing to the slight resistance of the curtains, their constant tearing in the wind, and the continuous driving of rain into the wharfhouses, all that the workmen could do was to rush about from ripped or bellying curtain to ripped or bellying curtain, covering sugar which had already been wet. Because of the force of the wind, tarpaulins could not be maneuvered into place and anchored behind the first line of tarpaulins draped over the landward and riverward edges of the stacked sugar, as could have been done during the preceding night since the tarpaulins were laid lengthwise parallel to the river, only the 4-foot vertical edge and the first 4 feet of the surface of the stacked sugar nearest the curtains were covered. The storm-driven rain penetrated the wharfhouses to at least 20 feet beyond the curtains. The sugar was piled to within 2 feet of the curtains. Accordingly, about 14 feet of the surface of

the stacked sugar behind those curtains which bellied or were ripped or blown from their moorings was not protected in any way. Thirty-three curtains in wharfhouses 3 and 4 were so badly ripped by the storm as to require replacement.

21. During the worst of the storm, all attempts to continue spreading tarpaulins had to be abandoned, and sugar behind curtains which bellied, tore or broke free during this period was entirely unprotected.

22. More than 2,795 bags of cargo sugar were wet during the storm. Loading of the sugar into cars began the following day. The damaged sugar was loaded into 9 separate cars. Plaintiff and intervenors claim only 2,795 bags, loaded into 7 of the 9 cars, as damaged. When the damaged sugar arrived at plaintiff's refinery, it was weighed, sampled and polarized, and the tare was calculated by employees of plaintiff. The weight of the 2,795 damaged bags claimed as damaged was:

| Gross | Net |
|---|---|
| 695,333 lbs. | 685,271 lbs. |

The average sucrose content, or polarization figure of the 2,795 bags of damaged sugar as found by the plaintiff was 90%. Intervenor's cargo survey report shows, however, that the sample of damaged sugar given the Surveyor McKee by plaintiff which polarized at 90% was not representative of the plaintiff's damaged sugar McKee surveyed in Stuyvesant Dock. It was much wetter. Further, this 90% polarization figure is inconsistent with the polarization figure found by the Godchaux Sugar Refinery for sugar damaged at the same time under identical conditions as the American sugar. The polarization figure of the Godchaux sugar was 94.725. The cargo surveyor for intervenors, a man of 20 years' experience in assessing damage to sugar, surveyed the Godchaux sugar at the same time he surveyed the sugar in suit. He testified that the damage by the hurricane to the American Sugar Refinery shipment stored in the Stuyvesant Dock was the same as the damage to the equivalent shipment of Godchaux Sugars also stored in Stuyvesant Dock at the same time under identical conditions. The sampling of the damaged sugar and the polarization tests made thereof were completed by the plaintiff itself without even the cargo surveyor of the intervenors present to check the sampling or the tests. The record reveals a substantial shortage of the sugar allegedly taken from the damaged bags as samples for test purposes. No explanation is made or even attempted as to why plaintiff claimed only seven of the nine cars of damaged sugar. It would appear, therefore, that the Godchaux Sugars polarization figure is more reliable than that obtained by plaintiff and must be preferred.

23. Practically all wharfhouses operated by the Board of Commissioners of the Port of New Orleans which operates the great majority of the wharfhouses in the New Orleans area, some wharfhouses operated by other railroads in the area, and the majority of privately owned and operated warehouses in the area, are, and for over 25 years before the storm in suit had been, equipped with sliding steel doors set in metal slots at either side which completely close the opening in which they hang and lock at the bottom. These sliding steel doors, which are more economical in the long run than canvas curtains because of greater length of useful life, lower maintenance costs, and greater protective efficiency, are, and for over 25 years before the storm in suit had been, the standard device for closing warehouses and wharfhouses in the New Orleans area.

24. Such sliding doors are superior to canvas curtains in these respects: a—they are far more resistent to wind pressures; and b—they are practically impervious to rain, whereas canvas curtains belly and allow rain to wash in under and alongside them even during ordinary squalls. None of the Dock Board's sliding doors were blown down during the hurricane in suit. A negligible number were blown out of their side slots, but, because of their weight, probably swayed relatively little in the wind.

25. Some of the wharfhouses of other railroads in the New Orleans area are equipped with canvas curtains which are long enough to overlap the opening in which they hang, and which can be tied off

at five places on either side. As protection against the elements even these curtains are superior to those maintained by defendant at Stuyvesant Dock.

26. Defendant's curtains are, and were known by defendant to be, inadequate protection even against the squalls which strike New Orleans several times each year. A *fortiori* are they inadequate protection against hurricanes.

27. New Orleans is in the heart of the tropical hurricane belt. Thirty hurricanes are known to have struck Louisiana. In the period 1907–1947, during which time the Stuyvesant Docks continuously belonged to defendant, three hurricanes of equal force struck New Orleans. Hurricanes are a weather factor which should and can be provided against in maintaining protective facilities such as wharfhouses and warehouses in the New Orleans area.

28. Defendant's negligence in failing to provide standard adequate doors or curtains in its wharfhouses contributed directly to the damage in suit.

29. Defendant directly contributed further to the damage in suit by the following acts and omissions of negligence on the part of itself and its agents:

· a—All of defendant's executives and workmen at the wharfhouses left work as usual at 5 P. M. on September 18, 1947, although the executives knew that a hurricane was expected the following day.

b—No workmen charged with protecting goods against the elements were at the wharfhouses during the night of September 18–19, 1947.

c—Defendant's system of alerting the dock superintendent and workmen in case of emergency, which was at best insufficient protection against sudden squalls and storms, failed competely to operate during the night of September 18–19, 1947.

d—No effort was made during the afternoon of September 18, 1947, or the night of September 18–19, to load the exposed sugar near the landward curtains into cars, although the cars were available.

e—No effort was made during the night of September 18–19, 1947, to move the exposed bags nearest the curtains back to safety in the interior of the wharfhouses.

f—No effort was made during the night of September 18–19, 1947, to spread and anchor tarpaulins over the exposed sugar near the curtains.

g—No executives or workmen arrived at the wharfhouses earlier than usual on the morning of September 19, 1947.

h—Less than half the usual complement of workmen reported to the wharfhouses on the morning of September 19, 1947, and no effort was made to replace the missing workmen.

i—Even when the first workmen reported to the wharfhouses, no effort was made to cover the sugar or to move the exposed bags to safety.

j—In spite of the hurricane warning, no extra precaution or effort of any kind was made to protect the sugar and to prevent the damage until the storm had struck.

30. At all material times, the base price in New Orleans of sound raw sugar polarizing at 96 degrees was 6.32 cents per pound. The fair market value of damaged raw sugar was calculated according to the price set up by contract with the Commodity Credit Corporation and that formula must be used in arriving at the value of the damaged sugar in suit polarizing at 94.725 degrees.

31. The sugar in suit, at all material times, was insured by intervenors, who have indemnified plaintiff and been subrogated to its rights.

#### Conclusions of Law.

1. This court has jurisdiction of this proceeding. 28 U.S.C.A. § 1332.

2. In Louisiana as at common law the carrier's responsibility as such attaches immediately upon delivery of the goods for transportation at the carrier's earliest convenience without further instructions from the owner. Article 2752, Louisiana Civil Code; W. H. & C. B. Hodges v. Louisiana Railway & Navigation Co., 180 La. 3, 156 So. 26; M. Greenwood & Co. v. Cooper, 10 La.Ann. 796; Galveston Wharf Company v. Galveston, H. & S. A. Railway Co., 285 U.S. 127, 52 S.Ct. 342, 76 L.Ed. 659; Pow-

286

hatan Steamboat Co. v. Appomattox Railway Co., 24 How. 247, 65 U.S. 247, 16 L.Ed. 682; 11 Tul.L.R. 632; 13 C.J.S., Carriers, § 145; 9 Am.Jur., Carriers, §§ 667, 674.

3. When damaged, the sugar in suit was in defendant's custody as a common carrier.

4. Where damage to a shipment is caused by an Act of God the carrier is excused thereby from liability for the loss unless it was concurrently negligent. Memphis & C. R. Co. v. Reeves, 10 Wall. 176, 77 U.S. 176, 19 L.Ed. 909; Lehman, Stern & Co. v. Morgan's Louisiana & Texas Railway, 115 La. 1, 38 So. 873, 70 L.R.A. 562; Louisiana Civil Code, Art. 2754.

5. A hurricane is to be classed among the Acts of God which no human power can prevent or avert. Whether it will relieve the carrier from liability depends upon whether its results or natural consequences could, by the exercise of reasonable forethought and prudence, have been foreseen and guarded against. National Rice Milling Co. v. New Orleans & N. E. R. Co., 132 La. 615, 652, 61 So. 708; Lehman, Stern & Co. v. Morgan's Louisiana & Texas Railway, supra.

6. If the carrier discovers that goods entrusted to its care are in peril of injury or destruction by a hurricane, then it becomes its duty to use actively and energetically all the means at its command, or which it might be reasonably expected that one engaged in such business would possess, to meet the emergency and save the property from injury, and any neglect to use means which prudent skilful carriers might ordinarily be expected to use in such an emergency, will subject the carrier to liability. National Rice Milling Co. v. New Orleans & N. E. R. Co., supra; Southern Cotton Oil Co. v. New Orleans & N. E. R. Co., 146 La. 541, 546, 83 So. 821.

7. Defendant having been warned of the approach of the hurricane and having knowledge of the unprotected condition of the sugar stored in its wharfhouse, nevertheless failed to take any action whatever to protect the sugar against the oncoming hurricane until the wind reached almost hurricane force, at which time because of the exposed condition of its wharfhouse and the cargo therein effective protective measures were impossible.

8. The defendant's negligence in failing properly to provide against the hurricane and in failing to take proper steps to protect the sugar in suit after being warned of the hurricane's approach precludes the pleaded defense of Act of God.

9. The defendant is liable to the plaintiff for the damage to the sugar.

10. Judgment for plaintiff.